JAMES P. THOMAS AND MARY LOU THOMAS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29942–81.     Filed June 4, 1985.

*Elliot I. Miller* and *Richard S. Kestenbaum*, for the petitioners.

*Joseph A. Maselli, Patricia A. Donahue*, and *Michael Goldbas*, for the respondent.

STERRETT, *Chief Judge*: By notice of deficiency dated September 25, 1981, respondent determined a deficiency of $37,411 in petitioners' 1978 Federal income tax.[1] The ultimate issue for decision is the amount, if any, that petitioners are entitled to deduct in 1978 for "mining development costs," "operating management fees," and "professional fees."

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

At the time they filed their petition herein, petitioners, who are husband and wife, resided at 2309 Jefferson Street, Bluefield, West Virginia. Petitioners filed their Federal income tax return for the year in question with the Office of Internal Revenue in Memphis, Tennessee.

The determined deficiency in this case arises out of petitioner James P. Thomas's participation in the Wise County Mining Program (hereinafter sometimes referred to as the program), which was organized and operated for the avowed purpose of exploiting certain coal rights. When used hereinafter, "petitioner" will refer to James P. Thomas.

The Wise County Mining Program was organized primarily through the efforts of Samuel L. Winer, who actively engages in the structuring of various types of tax-sheltered investments, promising as high as 6-to-1 writeoffs. Winer first became involved in coal mining ventures in 1976, when he

---

[1]The parties in the following docketed cases have agreed to be bound by the final decision in this case: Jerry D. Legg and Carolyn Legg, docket No. 30322–81; Kenneth D. Bird and Ronnette M. Bird, docket No. 30597–81; James E. Gooding and Mary Lou Gooding, docket No. 7674–82; Frank N. Fleischer and Barbara C. Fliescher, docket No. 11208–82; Ralph M. Stephan and Marilyn L. Stephan, docket No. 25829–82; Myron C. Abramson, docket No. 32913–83; and Louis L. Witkin and Ann Witkin, docket No. 1777–84.

joined Knox County Partners, Ltd., as a general partner.[2] In 1977, Winer formed Investors Coal Corp. (Investors Coal), and through that corporation, he organized and managed several coal mining ventures, including Investors Mining Programs 77–1 through 77–5[3] and Investors Mining 78–1. Winer served as president of Investors Coal, and he and his wife were the sole shareholders and officers of the corporation.

In late October 1978, Winer was contacted by his attorney in Miami, Florida—Ronald Fieldstone, of Levine & Fieldstone— about developing the coal program that eventually became known as the Wise County Mining Program. Fieldstone had represented Winer in connection with a different coal mining venture organized earlier in the year. Fieldstone invited Winer to his office to meet with Bill Humphreys, a miner from Norton, Virginia. At that meeting, Winer told Humphreys that he might be interested in negotiating a coal venture if Humphreys would perform services with respect to the property on a turnkey basis. After Winer met Humphreys he telephoned a reference at the Bank of Pound, Virginia, who informed him that Bill Humphreys and his brother, Jim Humphreys, had "a big mountain" and did extensive mining.

At the end of October or the beginning of November 1978, Winer traveled to Norton, Virginia, to meet with Bill Humphreys and his brother, Jim Humphreys, at the offices of Humphreys Enterprises, Inc. (Humphreys Enterprises), a production and management company primarily involved in strip mining. Jim Humphreys had joined his brother's business on a full-time basis in 1977 in order to handle administrative matters for Humphreys Enterprises. Prior to that time, Jim Humphreys' background was in the field of education.

After touring the offices of Humphreys Enterprises, Winer and the Humphreyses turned to a discussion of what sort of mineral leases the Humphreyses had to offer. The Humphreyses informed Winer that they had recently acquired the deep mining rights to the Clintwood seam on what was known as the Amburgey Hollow property in Wise County, Virginia, and had formed Shelton Coal Corp. (Shelton Coal) to develop the property. Shelton Coal was one-third owned by each Bill

---

[2] See *Seaman v. Commissioner*, 84 T.C. 564 (1985).

[3] See *Maddrix v. Commissioner*, 83 T.C. 613 (1984), on appeal (11th Cir., Mar. 12, 1985); *Estate of Blay v. Commissioner*, T.C. Memo. 1984–565.

Humphreys, Jim Humphreys, and one Douglas Shelton. These gentlemen were the officers and directors of the corporation, as well. Winer asked how much capital would be needed for a turnkey development of the mine and was informed that development of the mine, over approximately a 10-year period, would cost between $2,500,000 and $3 million. According to the Humphreyses, approximately $700,000 would be required as initial funding. An understanding was reached that, if a transaction between the parties in fact was consummated, the investors would put up approximately $700,000 in cash and execute nonrecourse promissory notes secured by the investors' interests in the mineral lease as "payment" for the deferred portion of mining development costs.

At this point, it was contemplated that Shelton Coal would be engaged to perform the actual mining operations and would be the obligee under the nonrecourse notes. The parties, at Winer's suggestion, agreed generally that, in the event Shelton Coal failed to mine sufficient coal to enable the investors to amortize their nonrecourse notes, the corporation would pay to the investors a sum that would be adequate to compensate for the shortfall in mining and also adequate to enable the investors to satisfy their notes. At some later date, Winer and the Humphreyses agreed that Shelton Coal would not pay cash to the investors in satisfaction of any default in the minimum mining commitment; rather, such a default would be evidenced by "offsets" or journal entries reducing the investors' notes.

Before leaving Norton, Virginia, Winer accompanied Bill Humphreys on a visit to various mine sites operated or supervised by Humphreys Enterprises. In addition, he flew over the Amburgey Hollow property in a helicopter. Winer did not see any mines operated or supervised by Douglas Shelton, but he was given a copy of Shelton's résumé. Winer left Norton, Virginia, with the understanding that he would send a mining engineer to inspect the Clintwood seam on the Amburgey Hollow property.

The Amburgey Hollow property, which consisted of approximately 169 acres, was acquired in fee in 1971 by Greater Wise, Inc., a leaseholding company owned and controlled by the Humphreyses. The property was acquired in conjunction with an overall acquisition of 126 tracts of property and the

buildings thereon for $400,000 in cash. The acquisition consisted of about 7,000 to 9,000 acres of property. In 1972, Greater Wise, Inc., leased all the property, with the exception of 1,000 acres, to Paramont Mining Corp. (Paramont). Pursuant to the lease, Paramont obtained both the surface and deep mining rights to the coal located on the leased property. On November 14, 1978, an agreement was entered between Humphreys Enterprises and Paramont, whereby Paramont authorized Humphreys Enterprises to deep mine the Clintwood seam of coal. In exchange, Paramont received mineral rights to another piece of property known as the Hagan Estate. Pursuant to the November 14, 1978, agreement, Humphreys Enterprises agreed to sell all coal mined from the Clintwood seam to Paramont for $23.50 per clean ton of coal, subject to upward or downward price adjustments. In the event that Paramont was unable to purchase the coal produced, then Humphreys Enterprises could sell the coal to third parties and pay Paramont 10 percent of the sales price. Paramont retained the surface mining rights to the Clintwood seam and, in fact, was mining the seam at the time Winer visited Humphreys Enterprises in late 1978, and continued doing so for a number of years thereafter.

The Amburgey Hollow tract is divided into two distinct areas separated by a narrow corridor or passageway. The southern portion of the property is much smaller than the northern portion. It was contemplated that mine development would commence on the smaller southern portion of the tract and then proceed through the passageway to the larger northern portion of the property.

Shortly after his trip to Norton, Virginia, Winer engaged Eric Roberts, a mining engineer, to prepare an engineering report on the Amburgey Hollow property. Roberts had evaluated coal property for Winer earlier in the year in connection with another transaction. The report was to consist of a reserve evaluation and a discussion of the quality of the coal, operating and development costs, and marketing. Roberts visited Humphreys Enterprises and inspected the proposed mine site on November 8, 1978. Jim Humphreys transported Roberts to a "highwall" where there had been previous surface mining operations and where it was proposed that mining would begin. Roberts measured the seam at 90 inches in height

at five locations along the highwall.[4] He observed an average of about a 5-inch shale parting in the seam. Roberts walked approximately one-half mile around the outcrop and made other inspections of the coal seam where it was outcropping. Roberts then flew around the mountain in a helicopter and observed that the seam was continuous through the mountain. From the helicopter Roberts could not observe the thickness of any parting in the seam.

After Roberts completed this inspection, he was transported back to the Humphreyses offices where he examined maps, surveys, and other data relating to the Amburgey Hollow property. The maps examined showed some rather extensive old mine works and some large areas designated "robbed" and revealed that there was a parting in the seam of up to 12 inches. Roberts failed to examine a map that had been revised on January 1, 1978, and that revealed extensive shale parting throughout the main portion of the coal seam. There were no core drillings when Roberts examined the property, and Roberts himself performed no core drillings.

Roberts rendered his written report on the proposed development of an underground mine on the Amburgey Hollow property in December 1978. That report contained a discussion of reserves, coal quality, a proposed mining plan, and development, production, and operating costs. Roberts concluded that, based on a 75-percent recovery rate, reserves amounted to 1,700,000 tons. He noted that a 14 C.M. Joy continuous miner would mine the coal and would take all the seam, including the "middle man" parting, and that the coal would be upgraded in a preparation plant. Roberts further noted that the shape of the lease would dictate several underground development reorientations over the life of the mine, but that this type of development would not affect "the projected production which should average at least 500 tons per day or 120,000 tons per year of salable coal." In Roberts' opinion, $2,600,000 was a reasonable amount to be charged for the development of the proposed mining operation. In estimating mining production costs of $13.65 per ton of clean coal, Roberts

---

[4]In his written report, Roberts actually indicated that he measured the seam at 90 inches in height at five "openings" into the seam along the highwall. At trial, however, Roberts admitted that the use of the word "openings" was a "misnomer," as there were no openings along the highwall.

assumed, inter alia, that continuous miner productivity would be 500 tons per shift; that the mine would produce on only one shift per day; that there would be production on 240 days per year; and that yearly production would amount to 120,000 tons of raw coal per year and 90,000 tons of salable coal. Roberts estimated overall operating costs per ton of clean coal as follows:

| | |
|---|---:|
| Minesite production cost | $13.65 |
| Haulage to wash plant | 1.50 |
| Interest and depreciation on equipment | 3.00 |
| Royalty | 2.50 |
| Contractor's profit | 1.85 |
| Return to investors for payments of development cost, etc. | 2.50 |
| Selling price to preparation plant | 25.00 |

Roberts used the $25 selling price because the Humphreyses told him that was the price they would receive from the Paramont tipple. Roberts did not independently verify that figure.

According to Roberts, he used a 75-percent recovery rate in computing reserves to compensate for barrier pillars that would need to be left around the old mine works revealed on the maps he examined. Roberts also assumed a 25-percent reject rate to compensate for parting in the seam. Roberts' calculations did not take into account the effect of Paramont's operations. While visiting the Amburgey Hollow property, Roberts "mentally noted" that, should the need for backup reserves arise, there were large reserves on the surrounding areas that were under the control of the Humphreyses. In this connection, however, Roberts did not inquire with respect to the legal status of those reserves and was unaware of the property rights to other parcels of property surrounding the Amburgey Hollow property.

At some later date, Paramont prepared a reserve study of the Clintwood seam based on a core drilling program. Paramont's study determined total tonnage in place of 2,254,583 tons. Paramont's study of coal reserves in place was computed over 207.08 acres and revealed an average seam characteristic of 39 inches coal, 24 inches shale, and 36 inches coal. Core drilling studies performed on behalf of Paramont indicated a parting in the seam ranging from approximately 20 inches to 5½ feet in thickness.

By letter to potential investors dated November 28, 1978, Winer announced that Investors Coal had agreed to become the operating manager in a coal mining program in Wise County, Virginia. In his letter, Winer broke down the projected tax benefits for 1978 as follows:

| | |
|---|---|
| ($74,340) | Taxable loss |
| 37,170 | Tax savings (50-percent bracket) |
| 25,000 | Investment (1978) |
| 12,170 | After-tax cash flow |

By a private offering memorandum dated November 30, 1978, Investors Coal, as "operating manager," offered for sale 36½ working interests in the Wise County Mining Program at $25,000 cash per working interest. The offering memorandum stated that, in addition, Winer, as president of Investors Coal, would purchase a one-half working interest for $500, and the principals of the sublessor (Humphreys Enterprises) and of the contract miner (Shelton Coal) would purchase a minimum of eight working interests.

The offering memorandum indicated that the total proceeds received by the Program, consisting of $912,500 in cash paid by the investors, $1,930,000 in nonrecourse notes executed by the investors, and $500 in cash paid by Winer, would be used as follows:

| | |
|---|---|
| $695,000 | Cash to be paid to the contract miner for development costs |
| 1,930,000 | Nonrecourse notes to be paid to the contract miner for development costs |
| 5,000 | Rental payment to sublessor |
| 30,500 | Organizational expenses, legal fees, accounting fees, and printing fees |
| 80,750 | Initial management fee to be paid to the operating manager |
| 10,500 | Working capital for the program |
| 91,250 | Fees to be paid to selling brokers, offeree representatives, and other advisers |

The offering memorandum summarized the estimated 1978 tax effects per working interest as follows:

| | |
|---|---|
| Mining development costs | $71,150 |
| Other deductible expenses | 3,000 |
| Approximate total deductions | 74,150 |

Per unit cash investment...................................................... $25,000
Approximate ratio of per unit
  deductions to per unit investment ...........................................3.00 to 1

Investors were informed of a seemingly exhaustive list of potential risks inherent in the investment. It was noted that the sublessor had committed itself to provide, at its sole expense, additional coal-bearing acreage to the program to the extent that commercially merchantable and minable coal on and under the property did not equal 1,500,000 tons; however, it was further noted that there could be no assurance that the sublessor actually would be able to provide such additional property. With respect to market prices and the sale of coal, in general, it was noted that the operating manager had been advised that the program could expect to receive an average price of $25 per ton of coal mined, unwashed, and delivered to the washing plant. Nevertheless, investors were warned that coal prices were subject to wide fluctuations. Furthermore, it was contemplated that the contract miner would have the right, if an investor so elected, to serve as the investor's sales agent for a 1-year renewable period. Given that the sales agent was not to be authorized by the investors to enter into long-term contracts for the sale of coal, it was noted that an investor might have difficulty in taking advantage of certain favorable long-term contracts for the sale of his respective share of the coal. Another significant risk noted was that there could be no assurance that the contract miner would adequately develop and mine the property. In this connection, investors were cautioned that a cessation of development and mining activities for any extended period could leave the program with insufficient funds to conduct further operations. Other risks noted, included, inter alia, the fact that the operating manager had limited previous experience in the operation of a coal mining business and that conflicts of interest between the program and the sublessor or contract miner currently existed and would continue to exist in the future.

Although the offering memorandum devoted some discussion to the proposed operations of the program and the background of the coal mining industry in general, the focal point of the offering memorandum unquestionably was on the potential tax consequences to investors as evidenced by the 53-page tax opinion prepared by Fieldstone's law firm and

attached to the memorandum and a rather thorough summary of the opinion contained in the actual body of the offering memorandum. The memorandum cautioned that, since the IRS was challenging "tax sheltered investments," prospective investors should take into consideration the increased audit potential. In addition, it disclosed that the Service currently was auditing the tax returns of investors in other programs conducted by companies affiliated with Investors Coal.

An examination of the tax opinion reveals that a primary concern was in determining the status of the program for Federal income tax purposes. The tax opinion concluded that the program should be treated as a partnership and not as an association taxable as a corporation for Federal income tax purposes. However, the opinion further concluded that the program should be classified as an organization that qualified to elect under section 761(a), I.R.C. 1954, to be excluded from the application of subchapter K, in which event neither the program nor the investors would be subject to the special "at risk" provisions of section 704(d) as in effect for the 1978 taxable year.

In addition to the tax opinion, various other exhibits were attached to the offering memorandum. Those exhibits included a copy of the engineering report prepared by Roberts,[5] a joint operating agreement, a sublease agreement, a mining services agreement, a mining development agreement, a sales agreement, a chart of financial projections, and execution documents, such as the subscription agreement, statements of the section 761(a) election, and a nonrecourse promissory note.

Pursuant to the joint operating agreement, which was to be executed by each investor in the Wise County Mining Program and Investors Coal, as operating manager, Investors Coal was vested with the authority to act as agent on behalf of each investor to carry out the ministerial and administrative duties in connection with the program. However, the operating manager was not authorized to perform certain specified acts without the consent of two-thirds of the working interests. The investors reserved the right to their pro rata shares of the coal

---

[5]The copy of Roberts' report that was attached to the offering memorandum contained essentially the same information as his originally prepared report, except that the report attached to the offering memorandum contained an estimated higher production cost and a higher return to investors and did not take into account contractor's profit.

mined from the property and the right personally to sell or direct the sale thereof for their respective benefits. As compensation for services rendered, the operating manager was to receive $80,750 as an "initial management fee"; $0.50 per ton of coal mined and removed from the property as an administrative fee; 10 percent of the net sales proceeds in excess of $25 per ton; and reimbursement for its out-of-pocket expenses incurred in the performance of its services. In addition, the operating manager was authorized to allocate $0.15 per ton of the net sales proceeds due each investor as a reserve toward legal, accounting, insurance, out-of-pocket, and other miscellaneous expenses incurred in connection with the operation of the program. The joint operating agreement further provided that Winer, as president of the operating manager, would purchase one-half working interest for $500. The operating manager agreed to pay each investor, at least annually, the net proceeds from the sale of each investor's pro rata share of coal after all required cash obligations of each investor had been paid. The operating manager could be removed by the vote of investo̱ ꞉ ꞉wning at least 66⅔ percent of the working interests. By executing the joint operating agreement, each investor agreed to elect under section 761(a) to exclude the partnership from the application of subchapter K.

The sublease agreement was to be executed by Humphreys Enterprises, as sublessor, and each investor, as sublessee. Pursuant to the sublease agreement, the investors acquired the right to deep mine the property described in the sublease in exchange for an initial fee of $5,000 and a tonnage royalty of $2.50 per ton of merchantable coal mined, removed, and sold from the property. Under the terms of the sublease agreement, the sublessor and Shelton Coal warranted that to the extent that there were not commercially minable deep coal reserves on the leased property of at least 1,500,000 tons, they would, at their sole expense, contribute additional coal-bearing acreage of equal quality to compensate for such deficiency. In addition, in the event that the property could not be exploited because of another party's superior property rights or a deficit in title, the sublessor agreed to substitute other coal leases containing substantially equivalent recoverable coal reserves on terms no more onerous than the terms of the lease. The sublease

agreement contained the following provision (hereinafter referred to as the "force majeure provision"):

FORCE MAJEURE: The failure of either party to perform its obligations under this Agreement for reasons beyond their resepective [sic] controls after using every reasonable effort to cure and remedy any problems or consequence thereof as the result of Acts of God, acts of the public enemy, insurrection, riots, strikes, labor disputes, lock-outs, slow-downs, fires, explosions, floods, shortage of railroad cars, inability to obtain bonds and permits for reasons beyond the control of the Sublessees (e.g. a state policy of non-issuance), interruptions of transportation, embargoes, orders or acts of military or civil authority or adverse weather conditions that render hazardous the performance of the operations contemplated hereby or unavailability of equipment or replacement parts shall not constitute a breach of this Agreement or a violation of its terms and conditions. Also included shall be the unavailability of commercially merchantable and mineable coal on the Property pursuant to the representations of the Sublessor herein and the inability to obtain state and federal mining permits. The party determining the force majeure shall give notice to the other party following its determination that such conditions [sic] exists, stating specifically the date of commencement of the condition, the basis for the condition, and its anticipated duration.

The mining services agreement was to be executed by Shelton Coal, as the contract miner, and each investor. Pursuant to the terms of the mining services agreement, the contract miner was given the sole and exclusive right to mine all merchantable coal from the leased property. The investors, in return, agreed to pay the contract miner $17.95 per ton for coal mined and delivered to the investors or their designee plus 70 percent of the net sales proceeds in excess of $25 per ton received by the investors on the sale of the coal. The mining costs were subject to escalation in the event of, for example, any increase in the proven direct cost of mining. However, in no event were the mining costs to be escalated by any amount in excess of any per-ton increase received by an investor in connection with the sale of coal. The mining services contract contained a force majeure provision that was substantially identical to the one contained in the sublease agreement. Subject to the occurrence of force majeure, the contract miner agreed to mine no less than 120,000 tons of merchantable coal in each year of the agreement. (This provision sometimes hereinafter will be referred to as the minimum mining commitment.) The contract miner agreed that, if it failed to meet its minimum mining commitment in

any year, it would pay the program "liquidated damages" in an amount equal to $2.40 per ton multiplied by the difference between the 120,000 tons guarantee and the actual number of tons delivered in such year. The investors were given a number of remedies in the event of a default by the contract miner, including the right to foreclose on their security interests in equipment being used by the contract miner and the right to utilize such equipment.

A mining development agreement also was to be executed by Shelton Coal, as contract miner, and each investor. Under the terms of the mining development agreement, the contract miner agreed to develop the property, on a turnkey basis, in a manner that would enable the investors to deep mine the property at a rate of 120,000 tons per year, subject to the contingency of force majeure and prevailing economic circumstances. The term of the agreement was to continue until the contract miner completed development of the property or other property contributed to the investors by the sublessor. On the effective date of the agreement, the investors were to pay the contract miner $2,625,000 as full and complete payment for the development of the property, $695,000 of which was to be paid in cash and $1,930,000 of which was to be represented by nonrecourse promissory notes. The occurrence of force majeure, which was defined in the same manner as in the sublease agreement and the mining services agreement, would extend the maturity date of the installment payments due under the nonrecourse notes. The investors' remedies upon default by the contract miner included the right to foreclose on their security interest in the equipment being used by the contract miner, the right to utilize such equipment, and the right to sue for damages.

The sales agreement was to be executed by Shelton Coal, as sales agent, and by each investor. Pursuant to the terms of the sales agreement, each investor authorized the sales agent to arrange for the sale of his respective pro rata share of the coal mined from the property. No contract or commitment for the sale of coal could extend for a period in excess of 1 year. Although the sales agent was precluded from arranging long-term contracts, each investor was entitled to enter into long-term contracts for his own account. The sales agent was authorized and directed to pay from the coal sales proceeds

each investor's share of costs and expenses in the program. The sales agent would receive a commission of $0.25 per ton from each investor for selling the investor's share of the coal.

The financial projections attached to the offering memorandum were based on assumptions and estimates of the operating manager, including the assumption that the program would be able to mine and sell 120,000 tons of coal per year until the exhaustion of all recoverable reserves and the assumption of a $25-per-ton selling price. The projections were reviewed by Price Waterhouse & Co., which specifically declined to express an opinion on the fairness of the projections. The offering memorandum cautioned potential investors not to rely on the projections in considering whether to purchase working interests.

Petitioner purchased one working interest in the Wise County Mining Program by check dated December 4, 1978, and made payable to Investors Coal. On December 11, 1978, petitioner executed a copy of the joint operating agreement, the sublease, the mining services agreement, the mining development agreement, the sales agreement, and a subscription agreement. In addition, petitioner signed a statement electing, pursuant to section 761(a), to exclude the Wise County Mining Program from the application of the provisions of subchapter K and agreeing to use the accrual method of accounting for reporting taxable income or loss from his working interest in the program. On December 11, 1978, petitioner also executed a nonnegotiable, nonrecourse promissory note in the amount of $52,162 payable to Shelton Coal, as contract miner. The nonrecourse note represented petitioner's share of the deferred "mining development" expenses. By its terms, the note bore interest at the rate of 6 percent per annum. The note was payable monthly in arrears in principal installments of $362.23, together with accrued interest. The note was secured by petitioner's fractional undivided interest in the sublease.

As did petitioner, each of the other investors in the Wise County Mining Program signed the documents relating to his own investment at some time during the month of December 1978 and made his respective capital contribution to the program by paying in full his cash portion of the "mining

development" costs and by signing a nonrecourse promissory note for the deferred portion.[6]

On December 28, 1978, there was a formal closing of the transaction at the offices of Levine & Fieldstone, at which time the cash portion of the "mining development" cost and the nonrecourse, nonnegotiable promissory notes representing the deferred portion of that cost were delivered to Shelton Coal, and the $5,000 initial rental for the mineral lease was paid to Humphreys Enterprises. On the same date Shelton Coal delivered a document to Winer, as president of Investors Coal, wherein the former corporation agreed that in consideration for the $695,000 in cash plus the $1,930,000 in nonrecourse notes received from the investors in the Wise County Mining Program, Shelton Coal would "provide, in part, from such funds, amounts for working capital and equipment and/or purchases in order to enable itself * * * to expeditiously develop the coal property and mine a sufficient amount of coal to meet the required payments under the Mining Services and Mining Development Agreements." Shelton Coal also delivered a list of equipment that it had purchased or was planning to purchase in order to develop or mine the property.

On February 6, 1979, Winer informed the investors that the offering memorandum was mistaken when it indicated that Investors Coal would purchase a one-half working interest and that the corporation had actually purchased one working interest.

Incidental to the development of the mine, Shelton Coal began extracting and selling coal from the Amburgey Hollow property in January 1979. Investors Coal received and then distributed to investors the first distribution of coal sales proceeds in about the third week of January 1979. Subsequently, regular distributions of coal sales proceeds were made through July 1979. The distributions to investors were accompanied by written communications from Winer and so-called "Coal Sales Settlement Sheets." Each coal sales settlement sheet reflected, for the period in question, the coal sales proceeds and the deductions therefrom allocable to the particular investor. The items deductible from the gross proceeds in arriving at the amount of proceeds distributable to each

_____
[6]The check of one investor actually was dated Nov. 7, 1978.

investor included mining costs, sales commissions, royalty expenses, management fees, administrative expenses, and amounts necessary to retire the nonrecourse note held by Shelton Coal at the rate of $2.34 per ton.

Within a month after mining development commenced on the property, Shelton Coal began hitting old mine works. In fact, old mine works were hit on November 27, 1978, prior to the issuance of the offering memorandum and were again hit on December 8, 1978. By April 1979, Shelton Coal informed Winer that it was encountering old mine works and that the roof of the mine was beginning to shift. The corporation continued hitting old mine works during the succeeding weeks and by the last of July or the beginning of August the roof of the mine had shifted sufficiently to create a dangerous condition in the mine. Accordingly, Douglas Shelton of Shelton Coal contacted the Mine Safety and Health Administration (MSHA). MSHA thereafter inspected the mine and issued a closure order.

By letter dated August 13, 1979, Jim Humphreys informed Winer that Shelton Coal had exhausted all methods of getting through the old mine works, that the old mine maps were evidently inaccurate, and that the venture had been an "unfortunate experience." He further informed Winer that MSHA had issued a closure order with respect to the mine. Humphreys explained that the only other way to reach the coal was by entering the other side of the mountain. Since Paramount owned the strip mining rights to the property, which rights took precedence over the Program's deep mining rights, Humphreys stated that Shelton Coal was sending a separate letter invoking the force majeure provision in the mining services agreement.

When Winer learned of the closure of the mine he contacted Roberts and requested that he inspect the mine and review the closure order. Roberts concluded that uncharted extensive old mine workings and the thickness of the dirt bands in the middle of the coal seam had made the mining of the Clintwood coal dangerous and unprofitable. In Roberts' opinion, MSHA was justified in issuing the closure order.

By letter to Winer dated August 14, 1979, Shelton Coal invoked its force majeure rights effective as of August 1, 1979. By letter dated October 8, 1979, Bill Humphreys, on behalf of

Shelton Coal, informed Winer that Humphreys Enterprises, in conjunction with Pardee Coal Co., Inc., had provided Shelton Coal with a substitute boundary of mineral situated in Pardee, Virginia. Humphreys proposed that the program accept this substitute property in order to "avoid the necessity (and possible adverse tax consequences) of an extended and indefinite force majeure." However, Humphreys informed Winer that, due to increased production costs, Shelton Coal could not continue to operate without receiving at least an additional $1.60 per ton for its services. Humphreys proposed that Shelton Coal would distribute $0.35 per ton to the Program, of which $0.15 could be used for administrative costs, $0.10 could be distributed to the operating manager, and $0.10 could be distributed to the investors.

By letter to Fieldstone dated October 17, 1979, Winer relayed Bill Humphreys' request for an additional $1.60 per ton for services and suggested that the mine be closed until prices improved. Winer requested Fieldstone's opinion with respect to whether "the closing of the mine temporarily [would] affect our tax position."

The program's investors were not informed of the old mine works encountered by Shelton Coal or the closing of the mine until November 1979. By letter dated November 8, 1979, Winer professed to bring the investors up to date on the status of the program. He explained that in the summer of 1979, Shelton Coal had informed him of the problems created by hitting old mine works and that the mine had been closed in August 1979. He further explained that Shelton Coal was operating a mine in Pardee, Virginia, on behalf of the program and that the program was negotiating with Shelton Coal with respect to the amount of income the program would receive from the Pardee mine. The remainder of the letter was devoted to promoting an oil and gas drilling program. The investors were urged to make a prompt decision on the drilling program "in order to take advantage of the tax deductions possible for this year."

Upon learning that the force majeure provision had been invoked and that operations were being moved to Pardee, Virginia, at least two investors, Wendall Jackson and Nelson Link, voiced objections to accepting less profit per ton. Jackson did not believe that there were adequate grounds for invoking

force majeure since he believed that it was common knowledge that old mine works existed in the area of the Clintwood seam and that any competent operator possessed the means by which to overcome the problem.

Winer eventually decided that, rather than risk a lawsuit by Jackson, who is an attorney, he would decline to accept the proposal that the Pardee mine site be used for the benefit of the program and, instead, would wait for Paramont to complete its strip mining activities before attempting to re-enter the Clintwood seam through the other side of the mountain.

Notwithstanding the invocation of force majeure, Shelton Coal informed Winer on January 6, 1980, that, although it could not afford to mine the Clintwood seam on the Amburgey Hollow property, it was looking for subcontractors; however, according to Shelton Coal, it was doubtful that any contractor would be willing to mine the coal pursuant to the terms of the mining services contract without receiving additional compensation from the investors.

In February 1980, Paramount informed Shelton Coal that its strip mining activities would continue until approximately January 1982.

During the next several months, Winer received a series of written communications from irritated investors who believed that force majeure had been invoked improperly and that Winer was not performing his administrative duties properly. Jackson was especially persistent. Time and again he wrote to Winer requesting information about the status of the Program. In addition, he asked for a list of the investors, but was unsuccessful in getting Winer to turn over such a list. Jackson wanted the names of the other investors so that they could take joint action aimed at firing Winer and bringing a suit against him. Eventually, disillusioned by what he characterized as Winer's "pleasant and innocuous" replies, Jackson filed suit against Winer, alleging failure of consideration, fraud, breach of contract, and violations of Securities and Exchange laws.[7]

Throughout this period of time Winer and the Humphreyses, directly or through their attorneys, engaged in a number of either verbal or written communications regarding the lack of

---

[7]Winer countersued Jackson. At the time the trial was held herein, Jackson's suit was pending before a Federal District Court.

operations. However, Winer failed to take any sort of affirmative actions to enforce what he characterized as the investors' "turnkey rights" against Humphreys Enterprises and Shelton Coal.

It was not until April 1981 that Shelton Coal located a contractor, Triangle Mining, Inc. (Triangle Mining), that was willing to mine the Clintwood seam, albeit not in accordance with the terms of the original contracts executed by the investors. By letter dated April 24, 1981, Jim Humphreys, on behalf of Shelton Coal, advised Winer to accept the proposed terms of the contract with Triangle Mining, citing as one advantage of the arrangement that "The Program would be back in operation and possibly be in a better [position] to withstand an attack by the IRS on the tax treatment offered it." By letter dated May 4, 1981, Winer passed the news on to the investors, by stating that "We are in the process of offering a contract to an experienced mining company." In his letter, Winer enumerated some of the required changes in the original contract and the advantages inherent in offering a contract to Triangle Mining, including the advantage mentioned by Jim Humphreys.

By letter dated August 12, 1981, Winer solicited funds from the investors to be used for the purpose of retaining legal counsel to defend the investors' tax deductions. Several additional letters followed, urging reluctant investors to contribute to the "Legal Defense Fund" account. Winer advised that "Since we have had experience in doing this in other programs, your program can profit from this experience."

Notwithstanding the ongoing audits and the apparent ire of some of the investors involved in the programs masterminded by him, Winer continued to promote additional tax-sheltered investments of various types. The following excerpt is characteristic of the flavor of Winer's promotional literature:

The Utopian situation would be if we could create *tax deductions* which are applied against *high* tax rates and *income* which is taxed at *low* tax rates. While this strategy has been considered "pie in the sky" in the past, there is being created today by the Reagan Administration a scenario which fits this situation. I'm referring to the Administration's individual tax reduction plan. The Reagan tax deduction proposal includes a significant reduction for the highest marginal tax bracket. Therefore, tax deductions created by oil and gas investment during 1981 will be taken against today's high marginal

tax rates (maximum 70%) while income from these same investments will be taxed at the proposed lower marginal tax rates (maximum 50%).

Triangle Mining started mining the property in September or October 1981 and apparently continued to act as subcontractor until sometime in June 1982, at which time it was forced to admit defeat due to water problems created by the method of mining being used, as well as market conditions. Throughout this period, Triangle Mining mined a rather insignificant amount of coal. The coal that was mined was so dirty that it was not readily salable. In the proposal to hire Triangle Mining, it was stated that the program would participate in profits when the selling price of coal reached $35 per ton. However, in his letter to investors, Winer stated that $1.95 per ton profit would be paid to investors when Triangle Mining began operations. The coal sales settlement sheets issued to investors in conjunction with the distributions of the coal sales proceeds from the coal mined by Triangle Mining indicate that the investors were paid $1.31 per ton of the coal sold.

The mining contract with Triangle Mining was evidently canceled in September or October 1982 for failure to meet minimum tonnage requirements, failure to follow an approved mining plan, failure to keep insurance in force and effect, failure to comply with applicable Federal and State laws, and failure to mine diligently in a workmanlike manner.

By letter dated October 4, 1982, Humphreys Enterprises informed Winer that it had exhausted all possibilities of finding a contractor to deep mine the property and that, from that point on, the responsibility for continuing operations and engaging a new contractor lay with Winer. Winer did not respond to this letter.

Paramont's strip mining operations on the property were completed substantially by the time the trial was held in this case. By letter to Winer dated November 8, 1983, the president of Paramont expressed interest in deep mining the Clintwood seam. However, Paramont was willing to pay only a 1-percent royalty to the program. In addition, because of the high reject rate due to excessive parting, Paramont proposed to mine only the top portion of the coal seam. No definite agreement had been reached with Paramont at the time the trial was held herein.

The following chart is a compilation of data for all coal sales of the program from its inception up through the time of trial:

| Period | Raw tonnage | Clean tonnage | Gross sales | Net proceeds to co-owners | Net proceeds to petitioner (or proceeds per working unit) |
|---|---|---|---|---|---|
| 1/ 1/79–1/15/79 | 2,728.50 | 1,718.61 | $40,387.34 | $2,251.38 | $60.05 |
| 1/16/79–1/31/79 | 849.25 | 540.79 | 12,708.57 | 708.43 | 18.91 |
| 2/ 1/79–2/15/79 | 866.35 | 572.66 | 13,457.51 | 750.18 | 20.03 |
| 2/16/79–2/28/79 | 2,203.10 | 1,439.72 | 33,833.42 | 1,886.00 | 50.32 |
| 3/ 1/79–3/15/79 | 3,755.55 | 2,584.53 | 60,737.45 | 3,385.73 | 90.30 |
| 3/16/79–3/31/79 | 4,352.95 | 2,884.08 | 67,775.88 | 3,778.14 | [8]100.76 |
| 4/ 1/79–4/30/79 | [9]11,500.00 | 7,458.96 | 175,285.57 | 9,771.25 | 260.58 |
| 5/ 1/79–5/31/79 | 11,052.55 | 6,918.21 | 162,577.93 | 9,062.85 | 241.68 |
| 6/ 1/79–6/30/79 | 11,725.70 | 7,345.56 | 172,620.67 | 9,622.70 | 254.14 |
| 7/ 1/79–7/31/79 | 2,975.65 | 1,568.51 | 36,859.98 | 2,054.74 | [10]55.53 |
| 10/16/81–10/31/81 | 142.85 | [11]142.85 | 3,277.33 | 187.13 | 5.06 |
| 11/ 1/81–11/15/81 | 79.75 | 79.75 | 1,915.99 | 103.67 | 2.80 |
| 11/15/81–11/30/81 | 146.50 | 146.50 | 3,182.47 | 191.91 | 5.19 |
| 12/ 1/81–12/15/81 | 225.70 | 225.70 | 5,079.27 | 295.67 | 7.99 |

---

[8]There are no coal sales settlement sheets for this period. The $100.76 net proceeds figure is based on a letter written by Winer.

[9]The documents recording raw tonnage sold for this period are illegible in some respects, and we are able to determine only that raw tonnage sold approximated 11,500 tons.

[10]There are no coal sales settlement sheets reflecting net proceeds per working interest for the period July 1, 1979, through June 10, 1982. The figures appearing in the final column for this period equal one thirty-sevenths of the total net amount due to all investors.

[11]Evidently, the coal sold from October 16, 1981, through February 10, 1982, was sold on a raw tonnage basis.

| Period | Raw tonnage | Clean tonnage | Gross sales | Net proceeds to co-owners | Net proceeds to petitioner (or proceeds per working unit) |
|---|---|---|---|---|---|
| 12/16/81–12/31/81 | 18.15 | 18.15 | $408.46 | $23.78 | $0.64 |
| 1/ 1/82–1/10/82 | 57.35 | 57.35 | 1,353.22 | 75.13 | 2.03 |
| 1/26/82–2/10/82 | 185.20 | 185.20 | ?[12] | 242.61 | 6.56 |
| 2/11/82–2/25/82 | 548.65 | 363.27 | 10,244.21 | 475.88 | 12.86 |
| 2/26/82–3/10/82 | 414.40 | 265.67 | 7,491.89 | 348.03 | 9.41 |
| 3/11/82–3/31/82 | 735.85 | 465.31 | 12,874.88 | 609.56 | 16.47 |
| 4/ 1/82–4/15/82 | 558.05 | 364.79 | 9,849.33 | 477.87 | 12.92 |
| 4/16/82–4/30/82 | 22.05 | 15.21 | 410.67 | 19.93 | 0.54 |
| 5/ 1/82–5/15/82 | 903.00 | 591.41 | 16,677.76 | 774.75 | 20.94 |
| 5/11/82–5/25/82 | 832.05 | 566.12 | 15,682.58 | 728.52 | 19.69 |
| 5/26/82–6/10/82 | 473.15 | 313.84 | 8,850.29 | 411.13 | 11.11 |
| 1/ 1/79–6/10/82 | 57,352.30 | 36,822.75 | 873,542.67 | 48,236.97 | [13]1,286.51 |

John Hofmann, a CPA with Price Waterhouse & Co., was in charge of the program's accounting affairs. Specifically, he oversaw the program's election out of subchapter K, the preparation of the one and only Form 1065 filed by the program, and the preparation of information that was sent to each investor indicating the reporting positions to be taken on their Schedules C. The one and only Form 1065 filed by the program was filed for the calendar year 1978. Attached to the

---

[12]There are no coal sales settlement sheets reflecting gross sales proceeds for the period Jan. 26, 1982, through Feb. 10, 1982.

[13]Our calculations differ somewhat from respondent's calculations, as well as petitioner's calculations. However, having independently reviewed the relevant documents, we are unable to justify findings other than those set forth above.

Form 1065, which was left blank, was a statement of election pursuant to section 761(a)(2).

Petitioner, and apparently all of the other investors as well, elected the accrual method of reporting income and deductions attributable to their participation in the Wise County Mining Program. Items of income and expenses were allocated to the individual investors by reference to the number of units held by each investor. For the year in issue, 1978, the program had no income. The only items allocated to investors for that year were deduction items.

Petitioner was informed that he should report on his Schedule C for 1978 the following items:

```
Sales ....................................................................
Deductions:
  Mine development costs.................................$70,498
  Operating management fee ............................  2,211
  Professional fees..........................................    534
Net (loss) from operations .............................. (73,243)
```

For the years 1979 through 1982, statements were prepared on behalf of the Wise County Mining Program indicating that petitioner received the following income or loss from his investment in the Wise County Mining Program:

| Year | Net income (loss) |
|------|-------------------|
| 1979 | $576.98 |
| 1980 | no tax consequences |
| 1981 | 163.51 |
| 1982 | 3,632.08 |

Petitioner's statement for 1980 informed him that due to the fact that force majeure was invoked for the year, there was no mining penalty to be taken into income. Petitioner's statements for 1981 and 1982 did reflect, as income, mining penalties in the respective amounts of $1,945.94 and $7,561.81. The "mining penalty income" was attributable to Shelton Coal's failure to satisfy its minimum mining commitment as set forth in the mining services agreement. Shelton Coal did not make any actual cash payment of the "liquidated damages" called for in the mining services agreement. Rather, Winer and the Humphreyses had agreed that the "liquidated damages" arising out of a breach of the minimum mining commitment would simply result in an offset against the

investors' nonrecourse promissory notes to Shelton Coal. The offsets were allegedly accomplished by way of journal entries, reducing the amounts of those notes. However, Shelton Coal's balance sheets and income statements through January 31, 1983, reflect the full amount of the original $1,930,000 nonrecourse promissory note received from the Program. The record herein fails to reveal that any of the investors ever made actual cash payments in reduction of the nonrecourse notes executed by them, other than indirect payments chargeable against the coal sales proceeds attributable to them. In fact, as revealed in the tax opinion attached to the offering memorandum, it was contemplated from the outset that the notes would be paid out of the proceeds from coal sales.

On his Federal income tax returns for 1979 through 1982, petitioner took the following reporting positions with respect to his investment in the Wise County Mining Program:

| Year | Income (loss) |
|------|---------------|
| 1979 | no income or loss |
| 1980 | no income or loss |
| 1981 | no income or loss |
| 1982 | $3,632 |

Respondent disallowed the $73,243 deduction claimed by petitioner on his 1978 Federal income tax return on a variety of grounds.

## OPINION

Respondent advances a wide array of arguments in support of his disallowance of the deductions claimed by petitioner. His primary argument is that neither petitioner nor the Wise County Mining Program engaged in the coal mining activity with the primary and predominant objective of making a profit, and that, therefore, petitioner is not entitled to deduct for 1978 his allocable share of "mining development costs," "operating management fees," and "professional fees" under sections 162 and 616, I.R.C. 1954. Alternative arguments advanced by respondent include the following: (1) Petitioner is not entitled to a deduction for a mine development expenditure under section 616 because petitioner has failed to establish that an expenditure for "mine development" was paid or incurred in 1978; (2) even if petitioner is entitled to a

deduction for a mine development expenditure, such deduction should not include the nonrecourse note executed by petitioner, because that note was payable only in the event of successful mining operations and was therefore contingent; (3) the deduction for the mine development expenditure should be disallowed because it creates a material distortion of income; (4) the Wise County Mining Program was not entitled to be excluded from the application of subchapter K pursuant to a section 761(a) election because the partners' incomes could not be computed without computing partnership income; therefore, petitioner's distributive share of the partnership's loss is limited to his cash investment in the partnership pursuant to section 704(d);[14] and (5) petitioner is not entitled to deduct "operating management fees" and other "professional fees" because he failed to establish that these fees were ordinary and necessary business expenses under section 162(a).

### Mining Development Costs

On his Schedule C attached to his 1978 Federal income tax return, petitioner claimed a deduction of $70,498 for "mine development costs." We begin our discussion of the deductibility of the "mine development costs" by addressing respondent's profit motive argument. Solely for purposes of our discussion of this argument, we will assume, without deciding, that petitioner has properly characterized the expenses as "mine development costs."

Section 616(a) provides, in part, that there shall be allowed as a deduction all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. See *Anderson v. Commissioner*, 83 T.C. 898 (1984).

---

[14]Sec. 704(d), as in effect during the year in issue, provided, in part, as follows:

"A partner's distributive share of partnership loss * * * shall be allowed only to the extent of the adjusted basis of such partner's interest in the partnership at the end of the partnership year in which such loss occurred. * * * For purposes of this subsection, the adjusted basis of any partner's interest in the partnership shall not include any portion of any partnership liability with respect to which the partner has no personal liability. The preceding sentence shall not apply with respect to any activity to the extent that section 465 * * * applies, nor shall it apply to any partnership the principal activity of which is investing in real estate (other than mineral property)."

Sec. 465, as in effect during the year in issue, did not apply to a coal mining activity.

We agree with respondent that a deduction under section 616(a) is premised on a finding that the activity giving rise to the deduction is an activity engaged in with the primary purpose and objective of making a profit. Indeed, petitioner does not argue otherwise. The statute itself seems to contemplate the existence of a profit motive by requiring, as a condition to deductibility, that the ores and minerals have been shown to exist in "commercially marketable quantities." On numerous occasions we have held that other types of expenses incurred in connection with a coal mining activity are premised on a showing that the activity was engaged in with the primary and predominant objective of realizing a profit. See, e.g., *Seaman v. Commissioner*, 84 T.C. 564 (1985); *Surloff v. Commissioner*, 81 T.C. 210 (1983). As used in this context, "primary" means "of first importance" or "principally," and "profit" means economic profit, independent of tax savings. *Seaman v. Commissioner, supra* at 588; *Surloff v. Commissioner, supra* at 233. We know of no principled reason to apply a different test in the context of mine development expenses otherwise deductible under section 616(a).

The determination of whether the requisite objective exists is one of fact to be resolved on the basis of all the surrounding facts and circumstances. *Seaman v. Commissioner, supra* at 588; *Ramsay v. Commissioner*, 83 T.C. 793, 810 (1984); *Flowers v. Commissioner*, 80 T.C. 914, 931–932 (1983). The burden of proving the existence of the requisite objective rests with petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; *Golanty v. Commissioner*, 73 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight should be given to the objective facts than to mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; *Seaman v. Commissioner, supra* at 588; *Surloff v. Commissioner, supra* at 233.

In cases involving partnership activities, we have held that the profit motive analysis should be made at the partnership level. *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982). However, we have left unresolved the question of whether profit objective should be determined at the partner level, rather than the partnership level, where a section 761(a) election is made to be excluded from the

application of the provisions of subchapter K. *Ramsay v. Commissioner, supra* at 811; *Rosenfeld v. Commissioner*, 82 T.C. 105, 113 n. 13 (1984); *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 559 n. 9 (1979), affd. 633 F.2d 512 (7th Cir. 1980).

In the instant case, petitioner contends that the making of a section 761(a) election does not affect the level at which profit motive is tested. That is, petitioner believes that the profit motive analysis continues to be performed at the partnership level notwithstanding a section 761(a) election. On the other hand, without conceding the validity of the section 761(a) election, respondent contends that the practical effect of a section 761(a) election is to divide the business activity of a partnership into a joint activity and an individual activity, and that, therefore, the profit motive analysis must be applied at the partnership level with respect to the joint activity and at the partner level with respect to the individual activity.

Resolution of the issue of what effect a section 761(a) election properly should have on the profit motive analysis would not affect the ultimate disposition of this case, since we conclude that petitioner has failed to carry his burden of establishing the requisite profit objective at either level. Perhaps significantly, petitioner did not testify in the trial of this case. Accordingly, at most, we can only infer his individual investor objective by examining the activities of the Wise County Mining Program in general. An examination of these activities leads us to conclude that the program's coal mining venture was not an activity engaged in with the primary and predominant objective of realizing an economic profit. Accordingly, we do not decide herein whether a valid section 761(a) election was made in this case and, if so, what effect such an election would have on our profit motive analysis.[15]

It cannot be gainsaid that the Wise County Mining Program was promoted as a tax shelter. The first written communication received by potential investors, dated November 28, 1978, summarizes the projected tax benefits as creating a taxable loss for 1978 of $74,340 for each $25,000 investment. Thus, assuming the investor was in a 50-percent tax bracket, he was offered the prospect of his tax savings exceeding his cash

---

[15]Similarly, we express no opinion with respect to whether the Wise County Mining Program was in fact a "partnership" as defined in section 761.

outlay, thereby returning an immediate profit to him through the courtesy of the U.S. Treasury. This profit bore no relationship to the success, or lack thereof, of the coal mining operation. The offering memorandum subsequently received by investors reinforced the theme of tax benefits. An examination of the memorandum reveals unmistakably that the one topic most often discussed was the attractive tax benefits generated by the investment. In addition, Winer continued to tout the glories of additional tax-sheltered investments throughout his correspondence with investors in the program.

We do not accept petitioner's attempts to portray Winer as being knowledgeable in the business of coal mining. What the record reveals is that Winer had a great deal of experience in structuring tax shelters, many of which involved coal mining ventures. There is little evidence that he actually had any knowledge of the underlying coal mining business as such. In this connection, even the offering memorandum cautions investors that the operating manager had a limited background in the operation of a coal mining business. The record does reveal that Winer had experience in dealing with IRS challenges to losses reported by various ventures he promoted. In fact, some of those ventures have already been considered by this Court.[16] In our view, Winer's prior experience in dealing with the IRS and his knowledge of some of the factors looked to by this Court in determining the existence of a bona fide economic profit motive explain the rationale behind Winer's attempts to impress the overall transaction with the trappings of a bona fide venture. Notwithstanding his efforts in this respect, in our opinion the fact remains that tax considerations were Winer's paramount concern and that those considerations, rather than economic considerations, set the course of whatever actions were pursued by the program.

The fact that tax considerations, rather than economic considerations, laid the foundation for the program's actions may be illustrated by the making of the section 761(a) election. It is crystal clear from the record that the election was made in order to avoid the at-risk provision incorporated in section

---

[16]See *Seaman v. Commissioner*, 84 T.C. 564 (1985); *Maddrix v. Commissioner*, 83 T.C. 613 (1984), on appeal (11th Cir., Mar. 12, 1985); *Estate of Blay v. Commissioner*, T.C. Memo. 1984–565.

704(d) at the time the transaction was structured.[17] Winer was aware from Fieldstone's research that a section 761(a) election might not be respected under the IRS's ruling position unless (1) each investor reserved the right to take in kind and dispose of his respective share of any coal extracted, and (2) any delegation of authority to sell an investor's share of coal would be effective for no more than 1 year. Accordingly, under the terms of the joint operating agreement each investor reserved the right to his pro rata share of the coal mined and removed from the property and the right personally to sell or direct the sale thereof for his respective benefit. Under the sales agreement, each investor authorized Shelton Coal, as sales agent, to arrange for the sale of his respective pro rata share of the coal mined from the property. However, Shelton Coal was restricted from entering into contracts or commitments for the sale of coal that extended for a period in excess of 1 year. Shelton Coal's inability to enter into long-term contracts subjected the investors to a greater risk of market fluctuation and prevented them from taking advantage of favorable long-term contracts. This risk was specifically noted in the offering memorandum. Thus, while the section 761(a) election, if respected, could work to an investor's advantage from a tax perspective, it would do so at the possible expense of economic profitability. By requiring that investors agree to a section 761(a) election, Winer, as was his wont, allowed the tax considerations to predominate.

We find in the record numerous other examples of Winer's tendency to concern himself primarily with the tax aspects rather than the economic aspects of the transaction. For example, on learning of the mine closure order relating to the Amburgey Hollow property and Shelton Coal's request for an additional $1.60 per ton for services to be rendered on the Pardee property, Winer requested Fieldstone's advice with respect to whether the closing of the mine would affect the program's tax position. Further, the decision to hire Triangle Mining to resume operations on the Amburgey Hollow property was prompted, in large measure, by the need to place the program "in a better [position] to withstand an attack by the IRS on the tax treatment offered it." Correspondence pertain-

[17]See note 14.

ing to the decision to hire Triangle Mining is so ambiguous with respect to whether there would be any profit potential for the program as to leave us with the undeniable impression that profit potential was, at most, a subsidiary consideration. Winer's concern over preserving tax benefits at the expense of economic profitability goes to the heart of the profit motive issue.

Another indication of the absence of a primary profit motive is the fact that Roberts conducted only a superficial examination of the Amburgey Hollow property. Roberts' exploration of the property was completed in the course of 1 day, during which time he examined maps and other data provided to him by the Humphreyses, who, of course, controlled both the sublessor and the contract miner, and made an on-site inspection of the property. Roberts measured the coal seam at the site where mining was to commence on the smaller southern portion of the total tract. Roberts' observation of the larger, and more significant, portion of the tract was limited to viewing the property from a helicopter. By Roberts' own admission, he could not distinguish from the helicopter the thickness of the parting in the seam. Roberts' prepared his report on the property largely on the basis of the data he obtained from the Humphreyes and his brief on-site inspection of the property. It is abundantly apparent to us that Roberts' examination of the property was far too cursory to serve as a reasonable basis upon which to formulate a meaningful estimate of reserves.

The extent of the shale parting that ran throughout the Clintwood seam had a direct bearing on the coal reserve estimates and the minability of the property. The thickness of the parting was particularly relevant in this case, since it was contemplated that a 14 C.M. Joy continuous miner would be used to remove the coal. A continuous miner is a piece of mining equipment that cuts through the entire seam of coal, including the parting; therefore, the discrepancy between the raw tonnage and the clean tonnage mined with a continuous miner can be very significant. The evidence before us clearly indicates that Roberts paid scant attention to the importance of the parting in the Clintwood seam. There were no coal sample records, which would have revealed the extent of the partings, available at the time Roberts examined the property,

and Roberts himself did not perform any core drillings. In fact, as noted, Roberts did not even observe with the naked eye the extent of the parting on the larger northern portion of the tract. An examination of the maps of the Amburgey Hollow property reveals that it was the coal seam characteristics on the northern portion of the tract that were of crucial importance. Thus, Roberts' close observation of the coal seam outcropping *only* on the southern portion of the tract, where development would begin, seems misguided at best. Furthermore, although the Humphreyses apparently made all maps of the Amburgey Hollow property available to him, Roberts failed to examine a map that was revised only 11 months before his on-site inspection of the property and that revealed extensive shale parting throughout the coal seam.

Aside from the extent of the parting, Roberts failed to consider a number of other factors that would have been relevant, indeed crucial, in rendering a fair and accurate report on the property. For example, he failed to consider the effect on reserves of Paramont's ongoing strip mining operation. He concluded that Humphreys Enterprises had sufficient backup reserves to satisfy its guarantee to provide the program with 1,500,000 tons of recoverable reserves. However, in so concluding, he failed to inquire with respect to the legal status of existing property rights to these reserves. Finally, in our view, he failed to compensate adequately for the extent to which the property previously had been mined. Roberts testified that his use of a 75-percent recovery factor in estimating reserves compensated for old mine works by leaving a barrier pillar around the old works that were revealed on the maps he examined.[18] However, by Roberts' own admission at trial, it is common to encounter unmapped mine workings. According to respondent's expert, Thomas W. Howard, one can safely assume that mapped old mine works are more extensive than shown on the map because miners typically do not hire an engineer to go into the mine and map mine works that they have finished mining. In Howard's opinion, the unmapped old works hit by Shelton Coal were extensions of the mapped old mine works, and Shelton Coal reasonably should have ex-

---

[18]We note that Roberts subsequently testified that, in calculating the reserves, he assumed a 25-percent reject rate to compensate for the parting in the seam.

pected to hit those extensions. Even Roberts admitted that the old works hit were extensions of the mapped old works.

At trial, Roberts defended his estimate of reserves by pointing to the reserve study subsequently prepared by Paramont, which indicated total tonnage in place of 2,254,583 tons. We fail to see how this study provides a meaningful yardstick by which to compare Roberts' study. Paramont's calculation of coal reserves in place was computed over more acreage than Roberts' calculation. Furthermore, Paramont's study indicated an average seam characteristic of 39 inches coal, 24 inches shale, and 36 inches coal. Roberts, on the other hand, measured the coal at 90 inches in height, with an average shale parting of only 5 inches. Furthermore, subsequent core drilling studies performed on behalf of Paramont revealed a parting ranging from approximately 20 inches to some 5½ feet in thickness.

Roberts' report, in addition to being based on an insufficient exploration of the property, is deficient in other respects. His financial evaluation appears aimed primarily at justifying the "development" costs charged by Shelton Coal. In other words, the report does not appear to have been prepared for the purpose of determining whether, in fact, development of the property was commercially feasible. In the first place, his use of an anticipated $25-selling price per ton of coal was not based on any sort of independent study of marketability. By Roberts' own admission, he used the $25 figure because the Humphreyses told him that that was the price that they would receive from the Paramont tipple. This anticipated selling price was apparently based on the November 14, 1978, agreement between Humphreys Enterprises and Paramont, which provided that the latter corporation possessed the right-of-first-refusal to purchase coal mined from the Amburgey Hollow property on a clean-ton basis for $23.50 per ton, subject to price adjustments. Obviously, this agreement, alone, does not provide an adequate basis upon which to project a $25 selling price. The agreement neither guarantees a $23.50 selling price, let alone a $25 selling price, nor does it guarantee coal sales. In the second place, although Roberts' operating cost estimate took into account an estimate for investor profit, this latter estimate for profit did not take into account certain expenses that should have been taken into account in project-

ing the profitability of the venture to the investors. Such omitted expenses included, for example, the initial management fee of $80,750, the per-ton administrative fee of $0.50, and the per-ton sales commission fee of $0.25.

In short, after reviewing all of the evidence, we are left with a definite impression that, while Roberts is a qualified mining engineer, in carrying out his assignment with respect to the Amburgey Hollow property, he did no more than what Winer required of him, which was to prepare a report that would appear bona fide in the event that the program might ultimately run into trouble with the IRS.

Aside from Roberts' deficient evaluation, the only other evaluation of the potential profitability of the program was the equally deficient financial projections contained in the offering memorandum. Those projections were based on several unwarranted assumptions. For example, the projections assumed sales of 120,000 tons of coal per year until the exhaustion of all recoverable reserves. However, in estimating operating costs, Roberts projected only 90,000 tons per year of salable coal. Furthermore, the projections assumed a sales price of "$25.00 per ton f.o.b. at the tipple siding or wash plant." Again, for the reasons stated above, we believe that the assumption of a $25 sales price per ton was not warranted considering that there was virtually no investigation of the matter. Further, the $25 sales price figure used in the financial projection appears to have been based on the sale of raw tonnage rather than clean tonnage. However, Paramont had the right of first refusal to purchase coal mined from the Amburgey Hollow property for $23.50 per ton on a *clean-ton* basis.

We are not persuaded by petitioner's attempt to portray the program as being run in a businesslike fashion. While the evidence reveals that Winer did make certain commitments to the operational aspects of the program, when the dust settles, we cannot help but agree with Jackson's opinion, articulated in his testimony, that Winer took his initial "$80,000-odd and * * * tipped his hat to the problems, just cursorily attempted solutions, and then went on to other things."

Petitioner contends that Winer continually and diligently attempted to enforce the program's "turnkey" rights against the Humphreyses and Shelton Coal after Shelton Coal invoked

the force majeure provision. In our view, if Winer believed that a "turnkey" contract had been breached, he was duty-bound to take some legitimate action to enforce the program's rights.[19] Instead, he did little more than make idle, innocuous complaints to the Humphreyses about the lack of operations. The various agreements executed by the parties provided the investors with a number of remedies that were never pursued by Winer, as president of the operating manager. We agree with respondent that it is very curious that Shelton Coal insisted that it was in a force majeure situation, but nonetheless began to look for subcontractors to mine the Amburgey Hollow property at about the same time that the IRS began to challenge the deductions taken by some of the investors. This leads us to believe that either the parties did not believe that a force majeure situation truly existed or that they were so concerned over preserving tax benefits that they seemingly found it convenient to "forget" that a force majeure situation existed. In addition, the record does not reveal any attempts to lift the mine closure order by submitting to the mining inspectors an alternative mining plan.

Winer also failed to communicate with investors in a responsible fashion. Although the initial distributions of coal sales proceeds to investors were accompanied by written correspondence from Winer, the communications dwindled after the distributions ceased. In addition, Winer failed to inform the investors of the operational difficulties encountered by Shelton Coal until November 1979. Yet, Winer had learned as early as April 1979 that Shelton Coal had begun hitting extensive old mine works.

The documents executed by all parties concerned clearly called for joint action by the investors. However, in practice, Winer ran the show and does not appear to have elicited any input from investors with respect to the decision-making processes. This fact is most vividly illustrated by Winer's refusal to turn over the names of the investors to Jackson, who wanted to institute action to replace Investors Coal Co. as operating manager.

Petitioner contends that, in making our determination of whether the requisite profit motive existed in this case, it is

---

[19]The foregoing is not intended to imply an acceptance of petitioner's characterization of the program's rights as "turnkey" in nature.

inappropriate for us to take into account the fact that anticipated economic projections were not met by the program. Of course, we agree with petitioner that the operational failure of a particular transaction in and of itself does not destroy an otherwise valid profit motive; however, it is a relevant factor to be taken into account in determining whether there was an adequate preliminary investigation performed with respect to the property and whether the parties to the coal mining venture in question possessed a bona fide intent to mine and sell coal for economic profit at the time they entered into the transaction. In this connection, we cannot refrain from adding that many, if not most, of the plethora of coal shelter cases that have come before this Court recently, some of which were promoted by Winer, himself, have been financial debacles. It is not surprising, therefore, that this Court has grown skeptical of the myriad of excuses advanced by taxpayers for the financial failure of one coal tax shelter after another. The same is true in the instant case.

Petitioner argues that the financial calamities encountered by the program were attributable to unforeseen circumstances, including depressed market conditions. It is difficult for us to accept the proposition that unforeseen circumstances caused the economic adversity with which the coal mining venture met, in light of our conclusions that the preliminary investigations of the economic viability of the venture were scanty and superficial, that the activities of the program were not conducted in a businesslike fashion, and that there was virtually no meaningful investigation into the marketability of the coal. One cannot simply shut one's eyes to the circumstances that may impact upon the viability of a transaction and then be heard to complain that unforeseen circumstances caused the economic downfall of that same transaction. We also note that petitioner presented no credible and verifiable evidence with respect to the prevailing market prices for coal during the years in question. With the foregoing in mind, we direct our attention to a comparison of actual to projected results from operations.

The program estimated production of 120,000 tons of salable coal per year, or 1,500,000 tons of salable coal over the course of the lease agreement. However, from the inception of the program through June 10, 1982, when mining operations

terminated, total clean tonnage mined equaled approximately 36,822.75 tons. Therefore, less than 3 percent of total estimated salable reserves was mined during this period. Likewise, less than 3 percent of the 1,500,000 minimum salable coal reserves warranted by Humphreys Enterprises was mined during this time. Average tonnage of clean coal mined over the 4-year period from 1979 through 1982 was approximately 9,206 tons per year. Therefore, less than 8 percent of the annual estimated coal production of 120,000 tons per year was realized over the 4-year period. Likewise, less than 8 percent of the minimum tonnage warranty of 120,000 tons per year was realized from mining operations from the inception of the program until mining was terminated. With respect to the cash distributions to petitioner, the financial projections included in the offering memorandum projected $18,756 of cash distributions per unit investment for the years 1979 through 1982 and total cash distributions for the life of the lease of $74,460. However, during the years 1979 through 1982, when mining was terminated, petitioner, who purchased one unit of investment, received cash distributions totaling only approximately $1,286. Therefore, petitioner realized less than 7 percent of his projected cash distributions for the 4-year period from 1979 through 1982 and less than 2 percent of his projected cash distributions for the life of the lease.

Petitioner makes much of the fact that the "final score on this project has not yet been tallied." Maybe not, but we seriously doubt that any investor has written in for playoff tickets. He alleges that the program is still viable and that negotiations with Paramont for the resumption of mining the Clintwood seam are ongoing. Based on what the record reveals with respect to negotiations up to the time of trial, we have serious doubts that any resumption of mining by Paramont on the investors' behalf will prove economically profitable to them. Paramont's proposal to mine the Clintwood seam specifically stated that the corporation would be willing to pay only a 1-percent royalty to the Wise County Mining Program and further stated that Paramont would only mine the top portion of the coal seam above what Paramont characterized as excessive parting.

Our conclusion that the primary objective of the Wise County Mining Program was to secure tax benefits rather

than to earn an economic profit is buttressed by the large nonrecourse notes executed by the investors. We have indicated on numerous prior occasions that the existence of large nonrecourse notes in circumstances where it is unlikely that the notes will be paid is itself an indication that the primary objective of an activity is to generate tax deductions. See, e.g., *Seaman v. Commissioner, supra* at 596; *Ramsay v. Commissioner, supra* at 820; *Estate of Baron v. Commissioner,* 83 T.C. 542, 556 (1984), on appeal (2d Cir., Mar. 26, 1985); *Surloff v. Commissioner, supra* at 237–238; *Flowers v. Commissioner, supra* at 937.

The totality of the facts reveals that the notes in question were contingent in nature and actually payable only in the event that coal sales proceeds were realized. Although there apparently were no written agreements to this effect, it is clear that the parties so understood this to be the arrangement for paying off the notes. Evidently it was agreed that the notes would be amortized at the rate of $2.34 per ton of coal sold. At least, in practice, this is precisely what occurred. However, it was further agreed that, in the event Shelton Coal mined less than 120,000 tons of coal per year, the corporation would pay the investors "liquidated damages" in an amount sufficient for the investors to amortize their notes to the corporation. Winer and the Humphreyses reached a verbal agreement that Shelton Coal would not pay the investors the "liquidated damages" in cash, but rather would simply offset the balance of the notes. Thus, if coal sales proceeds were realized, a portion of those proceeds would be applied to amortize the notes and the remaining amount due under the notes would be extinguished by the so-called "liquidated damages." If no coal sales proceeds were realized, the notes would be satisfied entirely by way of the offsets generated through the "liquidated damages" arrangement. The net effect of the overall arrangement was that the investors would never be obligated to make an additional out-of-pocket cash payment in order to amortize their notes. Thus, petitioner herein purchased his initial $73,243 tax benefit for the grand total of $25,000.

Petitioner contends that his nonrecourse note was not contingent because the note "has been and will immutably be paid each and every year in the absence of mining." According to petitioner, due to the presence of the liquidated damages

arrangement, "There is no contingency whatsoever which could preclude the amortization of the deferred mining development obligation." In addition, petitioner points out that he is burdened with non-cash taxable income each year as the note is amortized by the offset arrangement. In our view, petitioner's contention is wholly without merit. On at least three separate occasions, we recently have rejected the contention that offset arrangements such as the one involved in the instant case cure the otherwise contingent nature of a nonrecourse note. *Seaman v. Commissioner, supra* at 599; *Maddrix v. Commissioner*, 83 T.C. 613, 623–625 (1984); *Estate of Blay v. Commissioner*, T.C. Memo. 1984–565. In the instant case, as in the prior cases, the parties never intended to make an actual cash payment of principal or interest if coal was not mined. Thus, the note was clearly contingent. Petitioner's contention that the note would be amortized immutably each year, even in the absence of mining, is particularly surprising in this case considering the parties took the position that a force majeure situation excused Shelton Coal from performing its minimum mining commitment and concomitantly excused "payment" of liquidated damages. In addition, petitioner's contention that he has been burdened with non-cash taxable income each year as the note is amortized by the offset arrangement is not supported by the record. Petitioner's Federal income tax returns for the years 1978 through 1982 were stipulated into evidence. An examination of those returns reveals that the only year in which petitioner took the so-called liquidated damages into account was 1982, a year that, of course, postdates the inception of the IRS audit.

The provision for giving the nonrecourse notes as payments of "mine development" expenses had absolutely no apparent business purpose. Petitioner's contention that the notes were given at the Humphreyses' request for assurance that the deferred mining expenses would be paid, simply will not withstand scrutiny. The face value of the notes had no bearing whatsoever on the amount that Shelton Coal would ultimately receive for mine development since such amount was wholly dependent upon the results of mining. Similarly, the purpose of the note could not have been to assure Shelton Coal of sufficient cash flow to finance mine development, since the

cash flow likewise was wholly dependent upon the results of mining.

There also appears to have been no business purpose for the offset arrangement. Winer testified that this arrangement was formulated to protect the investors' leasehold interests by preventing a default on the notes. However, the investors' leasehold interests would have been protected to the same extent, and the parties would have found themselves in essentially the same economic position, had they merely agreed to an initial $695,000 cash payment for mine development and a $2.40-per-ton development fee.

Failing to find any valid business purpose for the giving of the nonrecourse notes, we must and do conclude that the requirement that the notes be integrated into the transaction was intended to provide the investors with tax deductions, which in turn made it possible for the promoter to sell the working interests in the program. Cf. *Surloff v. Commissioner*, *supra* at 237.

Having concluded that petitioner has failed to carry his burden of proving that the coal mining activity was engaged in with the primary and predominant objective of making an economic profit, we need not address respondent's alternative arguments for disallowance of the claimed "mining development" expense.[20]

## Operating Management Fee

On his Schedule C attached to his 1978 Federal income tax return, petitioner claimed a deduction of $2,211 for "operating management fees," which represented his allocable share of the $80,750 initial management fee received by Investors Coal as operating manager.

Respondent contends that petitioner is not entitled to a deduction for operating management fees because the program's mining activity was not an activity engaged in for profit and thus was not a trade or business within the meaning of section 162. Respondent also contends that, in any event, the operating management fees were not ordinary and necessary business expenses within the meaning of section 162(a),

---

[20]Since the Wise County Mining Program generated no income in 1978, sec. 183(b)(2) is not applicable.

but, instead, were organizational expenses that must be capitalized. Petitioner, on the other hand, obviously contends that the operating management fees were ordinary and necessary expenses. His brief, however, fails otherwise to elaborate on his theory of deductibility.

In order for the operating management fees to be deductible, the requirements of section 162(a) must be satisfied. *Cagle v. Commissioner*, 63 T.C. 86, 91 (1974), affd. 539 F.2d 409 (5th Cir. 1976). It follows from our holding that the program's mining activity was not engaged in with the primary objective of making a profit, that the mining activity was not a trade or business within the meaning of section 162. Therefore, the management fees do not satisfy the requirements of section 162(a). Cf. *Surloff v. Commissioner, supra* at 240.

Moreover, we agree with respondent that the record indicates that the operating management fees were organizational expenses, which would have to be capitalized in any event. *Surloff v. Commissioner, supra* at 240; *Estate of Boyd v. Commissioner*, 76 T.C. 646, 659 (1981); *Kimmelman v. Commissioner*, 72 T.C. 294, 305–306 (1979); *Cagle v. Commissioner, supra*.

## Professional Fees

On his Schedule C attached to his 1978 Federal income tax return, petitioner claimed a deduction of $534 for "professional fees," which apparently represented his allocable share of $30,500 of "professional fees" paid by the program.[21]

Respondent contends that petitioner has failed to proffer sufficient evidence with respect to the deductibility of the professional fees and that, at any rate, the fees should have been capitalized.

We agree with respondent that petitioner has failed to carry his burden of proof on the issue. There was some brief testimony at trial with respect to the payment of "legal and accounting fees." In addition, the offering memorandum noted that $30,500 of the proceeds from the offering would be used

---

[21]Petitioner's Schedule C did not actually specify a $534 expense for professional fees. However, the reporting information sent to petitioner for purposes of filling out his Schedule C took this expense into account, and based on an examination of petitioner's Schedule C, it is clear to us that the total expenses claimed by petitioner included the expense for professional fees.

for "organizational expenses, legal fees, accounting fees and printing costs." Petitioner's brief goes no further than to refer to the alleged fact that "legal and accounting fees" were paid.

There is nothing in the record that would enable us to determine precisely what expenses made up the $534 "professional fees" claimed by petitioner. Since petitioner bears the burden of proof on this issue, it was incumbent upon him to enlighten the Court on this matter. Under the circumstances, we must hold that petitioner failed to carry his burden of proof on the issue, and we must sustain respondent's disallowance of the deduction.[22]

*Decision will be entered under Rule 155.*

---

[22]Petitioner does not contend that part of the "professional fees" are deductible under sec. 212(3) as ordinary and necessary expenses paid or incurred during the taxable year "in connection with the determination, collection, or refund of any tax." There is some indication that part of the "professional fees" may have been paid to Price Waterhouse & Co. in connection with various services rendered to the Wise County Mining Program. However, the record is too sparse to enable us to determine whether some portion of the "professional fees" may have been properly deductible under sec. 212(3). Cf. *Surloff v. Commissioner,* 81 T.C. 210, 241 (1983).