T.C. Memo. 2003-86


UNITED STATES TAX COURT


ROBERT SCHWARTZ AND DIANE SCHWARTZ, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13248-00.                    Filed March 25, 2003.


<u>Ira B. Stechel</u> and <u>Robert J. Sickinger</u>, for petitioners.

<u>Rosemarie D. Camacho</u> and <u>Peggy Gartenbaum</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes and accuracy-related penalties
as follows:

| Year | Deficiency | Penalty Sec. 6662 |
|------|-----------|-------------------|
| 1994 | $51,294 | $10,259 |
| 1995 | 58,018 | 11,604 |
| 1996 | 45,101 | 9,020 |
| 1997 | 25,635 | 5,127 |

The issues for decision are: (1) Whether the deductions taken by petitioner Robert Schwartz (Mr. Schwartz) and petitioner Diane Schwartz (Mrs. Schwartz) (collectively, petitioners) related to flowthrough losses incurred by Diane Racing International's (Diane Racing's) yacht activity were from an activity entered into for profit for 1994, 1995, 1996, and 1997 (years in issue) within the meaning of section 183;[1] and (2) whether petitioners are liable for accuracy-related penalties under section 6662.[2]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed the petition, petitioners resided in Islip, New York.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Petitioners also dispute the allowable portion of their itemized deductions claimed for each of the years in issue. As this issue is computational, we leave it for the parties to compute in accordance with this decision.

During the years in issue, Mr. Schwartz practiced medicine in West Islip and specialized in gynecological oncology. During the years in issue, Mrs. Schwartz was an Adjunct Professor of Special Education at Dowling College and an Assistant Professor at Hofstra University. Petitioners have three adult children: Benjamin, Anna, and Sarah.

Mr. Schwartz's interest in sailing began in the late 1960s. Around this time, he purchased his first boat, a 24-foot Columbian Challenger cruiser. In the 1970s, Mr. Schwartz then purchased a 34-foot Tartan cruiser. Mr. Schwartz began racing sailboats in 1980 and purchased a 39-foot Baltic racer-cruiser (Baltic 39). In 1984, Mr. Schwartz sold the Baltic 39 at a profit and then purchased a 48-foot Baltic racer-cruiser (Baltic 48). Mr. Schwartz then sold the Baltic 48 at a profit and purchased a 50-foot Soverel racing boat (Soverel 50) around 1990 to learn more about the 50-foot class of boats. Petitioners kept the Soverel 50 for 9 months to learn about it and to determine what expenses would be involved with this type of boat by chartering it.

The Association

Petitioners also purchased the Soverel 50 in order to join the 50-foot Association (the Association). The purpose of the Association was to allow owners of a similar class of boats to race at a variety of venues in the United States and other

countries.  The people involved with the Association were also involved with the America's Cup race.  The America's Cup occurred every 4 years, whereas the Association would have ongoing races. The incorporation papers signed in 1989 stated that the Association was formed as a "Social Club".  By 1991, however, owners were allowed to display advertising material from sponsors, and the Association reported sponsorship income in its financial reports.  Mr. Schwartz joined the Association during this period when sponsorships were being sought.

Mr. Schwartz viewed the Association as "an opportunity to potentially make a lot of money."  By 1990, the Association obtained sponsorship of $3.5 million for a trip to Japan and already conducted meetings with Volkswagen for other sponsorship. Petitioners' understanding of the Association was that any sponsorship money that came to the Association would be handed down to the members equally.

Mr. Schwartz respected the advice from the Association's members because "that's where all the best minds were" in the 50-foot sailing industry.  Mr. Schwartz consulted with professional racers regarding the business implications of owning a 50-foot boat.  Mr. Schwartz also consulted other professionals, including Stephen Benjamin, a sail manufacturer and sailing consultant, regarding expenses that would be incurred, e.g., sails for the

boat.  Mr. Schwartz was advised by these sailing professionals that purchasing a 50-foot boat would be a good investment.

The Diane and Diane Racing

On February 13, 1991, Mr. Schwartz purchased a 50-foot Nelson Marek racing sailboat (the Diane) from an unrelated third party for $350,000.  At the time of purchase, the Diane had a market value of $680,000.  Mr. Schwartz was able to purchase the Diane for approximately half its value because repairs were needed to the hull.  Mr. Schwartz thought he could make a profit from this venture because he bought the Diane at a "bargain" price.  Before purchasing the Diane, petitioners received oral financial projections from experts, including the then president of the Association, Wictor Forss.

In order to purchase the Diane and the necessary sails and equipment, petitioners received a mortgage on the Diane for $485,000.  Diane Racing's attorney, Ira Stechel, advised petitioners that ownership of the Diane should be maintained individually because the insurance policy would not allow Diane Racing to have ownership and the mortgage contained an acceleration clause if ownership changed.

The Diane was designed as a racing sailboat and did not include any personal amenities (e.g., toilet, kitchen, or sleeping quarters).  At the time they purchased the Diane, petitioners also owned two other boats (a 25-foot Black Fin and a

J-27 sailboat) which were used solely for recreation and maintained near petitioners' residence. The Diane, because of its vast size, was maintained in a professional yard in Jamestown, Rhode Island, a 5-hour drive from petitioners' residence. The Diane was also stored out of the water on dry dock.

After joining the Association, knowing of the sponsors, and purchasing the Diane, in August 1991, petitioners incorporated Diane Racing. Mrs. Schwartz was the sole shareholder of Diane Racing. Diane Racing was incorporated as an S corporation.

Petitioners had experience in business from their rental real estate business (Schwartz Realty) in Washington, D.C. Mrs. Schwartz did the paperwork for Diane Racing, such as paying the bills, maintaining an annual ledger and other financial records (e.g., keeping the canceled checks of expenses paid), maintaining correspondence, sending out promotional mailings, making boat arrangements (e.g., transporting the boat), and creating and maintaining a Web site for Diane Racing. Petitioners spent an average of 15 to 20 hours per week on Diane Racing.

Petitioners' son Benjamin was named president of Diane Racing. Having Benjamin as president allowed Diane Racing to qualify for lower insurance rates because Benjamin had a captain's license and was capable of repairing the Diane's engine. Additionally, through petitioners' and Benjamin's

contacts in the industry, petitioners were able to recruit a capable, professional crew.

The bank records of Diane Racing were originally maintained in Washington, D.C., so Benjamin could oversee the account while he was in Washington, D.C. Petitioners paid some boat expenses through their personal checking accounts because some expenses needed to be paid immediately and there was a lag time for checks to clear from the bank account in Washington, D.C. Once Benjamin left Washington, D.C., the bank account was moved to New York.

During the years in issue, the <u>Diane</u> participated in four to nine events each season, and each event could involve multiple races. The <u>Diane</u> received publicity because of its photos in sailing calendars, in a Patagonia catalog, and in a commercial for an Italian deodorant company.

The crew on the <u>Diane</u> was professionally operated. To participate in a race, the <u>Diane</u> required a crew of 15 members. Petitioners' children had participated as members of the crew; however, they would sail rarely because the children lived in different cities. Mrs. Schwartz has not stepped aboard the <u>Diane</u> since 1991 because of an arthritic condition.

<u>The Activity</u>

Petitioners expected the <u>Diane</u> to make a profit through the following ways: (1) Obtaining sponsorships that included

advertisements on the <u>Diane</u>; (2) building franchises; (3) chartering the <u>Diane</u>; and (4) reselling the <u>Diane</u>.

1. <u>Sponsorships</u>

The 50-foot class of boats developed in the late 1980s in Europe for the Admiral's Cup race. At that time, yacht races for this class of boats were heavily sponsored by different banks and corporations; thereafter, the class began to develop in America with numerous sponsors in order to train for the America's Cup race. Further, yachting events have become major sporting events, with races being nationally televised.

Petitioners, therefore, expected to find sponsors through the Association, which made a promotional videotape. Petitioners also mailed out hundreds of letters, with followup phone calls, to solicit other sponsors in 1993. Because of Mr. Schwartz's profession, petitioners expected to receive sponsorships from pharmaceutical companies.

2. <u>Franchising</u>

Petitioners foresaw the formation of an ongoing franchise league for sailboat racing because of the 4-year gap between the America's Cup races. Petitioners envisioned that the league would have 20 teams that represented 10 countries. Petitioners planned to encourage international interest (and, therefore, international sponsorship) in the league by having the <u>Diane</u> sail around the world twice promoting the league. Petitioners

were encouraged about forming a racing league because many of the owners in the Association had experience in sports franchising and, by 1991, there was media coverage of the 50-foot class of boats, e.g., television programs and hundreds of magazine articles.

### 3. Chartering Activity

The Diane was well suited for racing or racing-related charters, with its good design, decent size, simplicity of deck layout and sail plan, good sails, stable platform, and reasonable price. Further, petitioners foresaw that people would charter boats in order to test crews, sails, and other equipment, and to compete in events. Chartering for a race is common.

In order to obtain charters during the years in issue, petitioners placed advertisements in yachting magazines and the New York Times, created and maintained a Web site, used a broker, and sent out promotional materials. For publicity purposes, petitioners placed the Diane in "the most visible" regattas each year. Petitioners calculated that they would make a profit if they could find five or six steady charterers.

### 4. Resale

Petitioners expected to make a profit from the Diane because they had profited from the resales of their prior boats and thought that the replacement value of boats would keep increasing.

Petitioners were able to receive only one sponsorship from a Japanese company through the Association, which soon after disbanded in 1993. Petitioners expected to receive sponsorships from pharmaceutical companies because of Mr. Schwartz's profession; however, Congressional investigations of these companies deterred any sponsorships. At this point, petitioners began to focus their efforts on chartering the Diane.

During the years in issue, Mr. Schwartz had triple bypass heart surgery and was not aboard the Diane as often as in prior years. Petitioners also experienced financial pressure during the years in issue because they supported their children's graduate educations and were also subjected to malpractice lawsuits. Further, petitioners had lost $300,000 in savings because of activities by their pension plan administrator, who was indicted and went to jail because of his illegal activities with other pension plans.

During the years in issue, petitioners tried to increase profitability and to cut the Diane's costs by dismissing its full-time paid captain, hiring crew only when needed, racing in local races to lower the Diane's transportation costs, moving equipment containers to a free storage location, leaving the mast in for the winter, refinancing the Diane, and having the Diane reappraised to lower insurance rates. They also sold some of the sails that were not needed and placed more advertisements for

chartering the <u>Diane</u>.  At that time, petitioners still felt that the <u>Diane</u> could be chartered and a profit could be realized if they could secure a few charters annually.  Unfortunately, petitioners lost their two main charterers, Mark Morita and David Howell, because Mr. Morita went bankrupt and Mr. Howell died.[3]

<u>Change in International Racing Rules</u>

Beginning around the years in issue, the international racing rules changed.  In sailboat racing, certain rules exist in order to determine a sailboat's handicap for racing purposes. The <u>Diane</u> had been built under the International Offshore Rule (IOR).  The IOR had been the international rule since the late 1960s and early 1970s and through the year petitioners purchased the <u>Diane</u>.  The IOR allowed yachts of different sizes to compete fairly.  The IOR was replaced by the International Measurement System (IMS) and the Performance Handicap Racing Fleet (PHRF) system by 1993 or 1994.[4]  In order to increase the marketability of the <u>Diane</u>, petitioners modified the <u>Diane</u> so it could race under IMS and PHRF by removing the IOR speed bumps, changing the shape of the keel, and moving the weight around.  Before its modification, the <u>Diane</u> was one of the three fastest boats on the

---

[3]  In 1992, Mr. Morita chartered the <u>Diane</u> and then filed for bankruptcy. Petitioners chartered the <u>Diane</u> to David Howell from 1993 to 1995.  Mr. Howell promised to charter the <u>Diane</u> as long as he could, but then he died.

[4]  The IOR is still used in Mexico; however, the last IOR premier race occurred in 1993.

course.  After modification, the <u>Diane</u> was capable of sailing under IOR, IMS, and PHRF.[5]

## Effect of Luxury Tax on Industry

Another problem for petitioners occurred when the sailboat racing industry slowed in the early 1990s because of the imposition of the luxury tax under section 4002.  During this time, approximately 480,000 people lost jobs in the marine industry; as a result, there were not as many races and fewer people were chartering boats.

## Tax Returns

In preparing their tax returns, petitioners consulted Leonard Fruchter, a partner at a C.P.A. firm.  Mr. Fruchter concluded that petitioners had a profit motive after reviewing petitioners' efforts to find sponsors and to advertise, petitioners' ownership of other boats that were specifically used for recreational purposes instead of the <u>Diane</u>, and petitioners' maintenance of a journal for business expenses.  For each of the years in issue, on Schedule E, Income or Loss From Partnerships and S Corporations, petitioners claimed deductions for the flowthrough losses from Diane Racing.

------

[5] Changes could have been made to make the boat more attractive for chartering as an excursion boat (i.e., adding amenities, raising the deck, altering the interior structure of the boat), but they would have made the <u>Diane</u> incompatible for racing.

On September 26, 2000, respondent sent petitioners a notice of deficiency.  Respondent determined that petitioners were not allowed deductions relating to losses from Diane Racing under section 183 because Diane Racing was not an activity entered into for profit.  On December 26, 2000, petitioners filed a petition with this Court disputing respondent's determination.

OPINION

Section 183(a) provides generally that, if an activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided in section 183(b).  Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

The basic standard for determining whether an expense is deductible under sections 162 and 212 (and thus not subject to the limitations of section 183) is that the taxpayer must show that the taxpayer engaged in or carried on the activity with an actual and honest objective of making a profit.  Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); see Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980).

Whether the requisite profit objective exists is determined by looking at all the surrounding facts and circumstances. Keanini v. Commissioner, 94 T.C. 41, 46 (1990); sec. 1.183-2(b), Income Tax Regs. In determining whether such objective exists, it may be sufficient that there is a small chance of making a large profit. Sec. 1.183-2(a), Income Tax Regs. Greater weight is given to objective facts than to taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof.[6] Rule 142(a).

Section 1.183-2(b), Income Tax Regs., provides a list of factors to be considered in the evaluation of a taxpayer's profit objective: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, from the activity; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. This list is

---

[6] The parties do not argue the applicability of sec. 7491(a).

nonexclusive, and the number of factors for or against the taxpayer is not necessarily determinative, but rather all facts and circumstances must be taken into account, and more weight may be given to some factors than to others. Id.; cf. Dunn v. Commissioner, supra.

As an initial matter, we found petitioners' testimonies regarding the yacht activity to be credible. Other witnesses corroborated their testimonies.

Manner in Which Petitioners Carry On the Activity

The fact that a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. A change of operating methods, adoption of new techniques, or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive. Id.

Petitioners carried on the activity in a businesslike manner. A separate banking account for Diane Racing was maintained during the years in issue. Mrs. Schwartz did the paperwork for Diane Racing, including paying the bills, maintaining the bank account, and sending out correspondence. At trial and attached to the stipulation of facts, canceled checks relating to expenses paid for the Diane during the years in issue

and an example of the ledger that Mrs. Schwartz maintained were provided.

Further, during the years in issue, petitioners attempted to improve the profitability of Diane Racing through various methods, including hiring paid crew only when needed, entering local races in order to lower the Diane's transportation costs, refinancing the Diane, lowering the Diane's insurance rates, changing to a free storage location for the Diane's equipment, and modifying the Diane in order to meet the new international racing rules. Additionally, petitioners sent mass promotional mailings with followup phone calls, advertised, and created a Web site for the Diane in order to find sponsors and customers.

Expertise of Petitioners or Their Advisers

A taxpayer's expertise, research, and study of an activity, as well as his consultation with experts, may be indicative of a profit intent. Sec. 1.183-2(b)(2), Income Tax Regs. Mr. Schwartz's expertise in boats and research of the 50-foot boat industry indicate a profit intent.

Mr. Schwartz has been sailing since the 1960s. Prior to the Diane, Mr. Schwartz owned at least five other boats of various sizes and capabilities. The parties provided the sailing resumes of petitioners and Benjamin and extensive list of readings regarding the sailboat industry in petitioners' library. We have

no doubt that petitioners have expertise in the sailboat industry.

Further, petitioners joined the Association specifically to learn about 50-foot sailboat industry from the professionals in the field. Mr. Schwartz also consulted with others in the business who could advise him regarding the expenses involved with 50-foot sailboats and how to reduce those expenses.

Time and Effort Expended by Petitioners

The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners testified that they spent an average of 15 to 20 hours per week on Diane Racing. We find this time spent indicative of petitioners' commitment to this endeavor.

Success of Petitioners in Carrying On Other Activities

We have recognized that a taxpayer's success in other business activities may indicate a profit objective. See Hoyle v. Commissioner, T.C. Memo. 1994-592; sec. 1.183-2(b)(5), Income Tax Regs. We conclude that petitioners' success in other sailboat activities (e.g., reselling the Baltic 39 and Baltic 48 at a profit, chartering the Soverel 50) indicates a profit objective.

History of Income or Losses

A record of substantial losses over several years may be indicative of the absence of a profit motive. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Section 1.183-2(b)(6), Income Tax Regs., provides, however, that if losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such losses would not be an indication that the activity is not engaged in for profit. We conclude that the losses sustained were the result of unforeseen circumstances and are not an indication that the activity is not engaged in for profit.

Those unforeseen circumstances include: (1) Congressional investigations into the pharmaceutical industry which deterred sponsorships to petitioners by the industry; (2) the adverse effect of the luxury tax on the sailboat industry in the 1990s; and (3) after petitioners purchased the Diane, the change in the international racing rules. The Diane was built under the IOR, the system that had been in place since the late 1960s and early 1970s. Petitioners could not have known that the rules would change 2 years after their purchase of the Diane. Although the Diane was still a competitive boat, it was less attractive to charterers because it was built under the old system.

Additionally, petitioners were unable to obtain sponsors because of the dissolution of the Association, petitioners lost their two main charterers when one went bankrupt and one died, and petitioners were distracted by Mr. Schwartz's surgery, malpractice suits, and their loss of savings due to a bad pension administrator.

Amount of Occasional Profits From the Activity

An opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Sec. 1.183-2(b)(7), Income Tax Regs. We conclude that petitioners had an opportunity to ultimately profit from the activities associated with the Diane even though losses were actually generated. For example, petitioners expected to make an overall profit with the resale of the Diane because they purchased the Diane for half its then market value, they attempted to lower expenses related to the Diane, and they had experience reselling their other sailboats at a profit. The fact that losses were actually generated was caused by factors beyond petitioners' control rather than petitioners' lack of effort.

Financial Status of Petitioners

We conclude that petitioners' financial status during the years in issue indicates that the activity was engaged in for

profit. During the years in issue, petitioners were concerned about their financial status because Mr. Schwartz took time from work for his surgery, petitioners paid for their three children to attend graduate school, and petitioners experienced a large loss in savings because of a bad pension administrator. During these years, petitioners felt that they could not be involved with an activity that would result in large losses.

Elements of Personal Pleasure or Recreation

The absence of personal pleasure or recreation relating to the activity in question may indicate the presence of a profit objective. Sec. 1.183-2(b)(9), Income Tax Regs. The mere fact that a taxpayer derives personal pleasure from a particular activity does not, per se, demonstrate a lack of profit motive.

We are convinced that the personal pleasure of owning and using the Diane was secondary to petitioners' use of the Diane for profit because, during the years in issue, petitioners owned other boats that were used solely for personal pleasure or recreation and the Diane had no personal amenities (e.g., no toilet, sleeping quarters, etc.). Further, Mrs. Schwartz had not stepped aboard the Diane since 1991 because of an arthritic condition.

Conclusion

We hold that petitioners met their burden of proving that the Diane's activity was engaged in with an actual and honest

objective of making a profit; therefore, because deductions are allowable under sections 162 and 212 (and thus not subject to the limitations of section 183), we render respondent's alternative argument on this point as moot.[7] Further, respondent based the accuracy-related penalties upon respondent's disallowance of petitioners' deduction for flowthrough losses from Diane Racing's yacht activity. Accordingly, we render the issue moot.

In reaching our holdings herein, we have considered all arguments made, and to the extent not mentioned above, we conclude them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered for petitioners</u>.

---

[7] Respondent argued in the alternative that the deductions related to flowthrough losses claimed by petitioners from Diane Racing, which included depreciation deductions, should be disallowed as personal expenses under sec. 162.