T.C. Summary Opinion 2004-94


UNITED STATES TAX COURT


N. JOSEPH CALARCO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1530-03S.                    Filed July 20, 2004.


N. Joseph Calarco, pro se.

<u>Kimberly J. Webb</u>, for respondent.


HOLMES, <u>Judge</u>:

*"Taxation! Wherein?  And what taxation?"*

                          *Henry VIII act I, sc. 2.*[1]

---

[1] This case was heard pursuant to the provisions of Internal Revenue Code section 7463.  Section citations are all to that Code.  This decision is not reviewable by any other court, nor should the opinion or its literary references be cited as precedent in future proceedings.

Prologue

It is a truth little remarked on by scholars that tax law has been a fount of literature for 5,000 years. The oldest literary work still extant--the Epic of Gilgamesh--is a long narrative of a friendship begun during a protest against government exactions.[2] In more recent times, some of our language's most notable authors have used fiction to delve into tax policy: consider Shakespeare's criticism of the supply-side effects of a 16-percent tax rate;[3] Swift's precocious suggestion of a system of voluntary self-assessment;[4] and Dickens' trenchant observation on the problems of multijurisdictional taxing coordination:

> [The town's] people were poor, and many of them were
> sitting at their doors, shredding spare onions and the
> like for supper, while many were at the fountain,
> washing leaves, and grasses, and any such small

---

[2] David Ferry, "Gilgamesh, A New Rendering In English Verse", 14-15 (Farrar, Straus, and Giroux 1992).

[3] Shakespeare, "Henry VIII", act I, sc. ii. ("A sixt part of each? / A trembling contribution! Why, we take / From every tree, lap, bark and part o' th' timber; / And, though we leave it with a root, thus hack'd, / the air will drink the sap.")

[4] Jonathan Swift, Gulliver's Travels, A Voyage to Laputa, Etc. 162 (W. W. Norton & Co., Inc., New York, 1964) (1726). ("The highest tax was upon men who are the greatest favourites of the other sex, and the assessment according to the number and natures of the favours they have received; for which they are allowed to be their own vouchers. . . . The women were proposed to be taxed according to their beauty, and skill in dressing; wherein they had the same privilege with the men, to be determined by their own judgment.") See generally Levmore, "Self-Assessed Valuation Systems For Tort and Other Law", 68 Va.L.Rev. 771, 779 (1982).

yieldings of the earth that could be eaten.  Expressive
signs of what made them poor, were not wanting; the tax
for the state, the tax for the church, the tax for the
lord, tax local and tax general, were to be paid here
and to be paid there, according to solemn inscription
in the little village, until the wonder was, that there
was any village left unswallowed.[5]

Taxation has also sparked creativity in newer literary

genres.  See It's a Privilege on Urinetown: The Musical (RCA

Victor) (musical re excise tax); J. Kornbluth, Love and Taxes

(staged monologue re income tax) (unpublished manuscript, 2003).

Tax collecting jobs have helped finance the careers of such

notable revenue agents as Chaucer,[6] Paine,[7] and Hawthorne.[8]  And

tax records are a famously important source of information for

---

[5] Charles Dickens, "A Tale of Two Cities" 119 (Everyman's Library, Knopf, 2002) (1859).

[6] While Controller of the Customs, "[t]here was great variety in what [Chaucer] had to do, and he came in contact with a variety of people.  He must have seen infinite venality, witnessed colorful subterfuges, heard improbable and ridiculous dodges and lies and excuses."  Donald Howard, "Chaucer" 212 (1987).

[7] "I act myself in the humble station of an officer of excise, though somewhat differently circumstanced to what many of them are, and have been a principal promoter of a plan for applying to Parliament this session for an increase in salary." Letter of Thomas Paine to Oliver Goldsmith, December 21, 1772, Reprinted in George Hindmarch, "Thomas Paine:  The Case of the King of England And His Officers of Excise", Published by the Author in 1998, Surrey, England.

[8] Indeed, it is reported that Hawthorne once contemplated writing sketches entitled "Romance of the Revenue Service" and "an ethical work in two volumes on the subject of Duties", though sadly neither project was ever undertaken.  Randall Stewart, "Nathaniel Hawthorne, A Biography" 53  (Archon Books, 1970).

scholars of both ancient civilizations[9] and modern authors.[10]

This case follows in that long, but little-noted, tradition. Petitioner, N. Joseph Calarco, is a respected professor of theater at Wayne State University in Detroit. He also writes plays. On his 1997 tax return, he deducted his playwriting expenses as a Schedule C business loss. Respondent disallowed both the loss and several itemized deductions that petitioner took on his Schedule A. These disallowances created a deficiency of $3,869 to which respondent added an accuracy-related penalty of $774. Petitioner, following the lead of Henry VIII's first Queen Katherine,[11] filed a timely petition in this Court.

## Act I.  Background

Petitioner has at least four times filed petitions contesting respondent's disallowance of deductions that he claimed. The issues before the Court for those years were mostly whether specific deductions were allowable. In this case,

---

[9] See, e.g., Tonia Sharlach, "Provincial Taxation and the Ur III State" (2004).

[10] See A. L. Rowse, "William Shakespeare, A Biography" 280–281 (1963) (use of obscure records to trace author's movements); Vitale v. Commissioner, T.C. Memo. 1999-131 (use of obscene records to trace author's movements).

[11] "These exactions, whereof my sovereign would have note, they are most pestilent to the bearing; and, to bear' em the back is sacrifice to the load." "Henry VIII", I. ii. 11. 47-50.

respondent tries to sweep the stage of all his deductions by denying that petitioner's playwriting is a trade or business.

The parties were unable to negotiate a very extensive stipulation, and petitioner arrived at trial with an abundance of documentation for his 1997 expenditures. This threatened to force the Court into an item-by-item examination.[12] To make review more efficient, the parties were ordered to file a supplemental stipulation.

Even with an extension, it became clear that the parties would be unable to agree, so petitioner was ordered to file a supplemental statement of facts organizing and explaining his claimed expenses by category. Respondent was then ordered to file comments.

We must address three issues:

1) Was petitioner's playwriting an activity entered into for profit?

2) If it was, did petitioner meet his burden in substantiating each expense and its relationship to his playwriting activities as required under the Code?

3) Does petitioner owe an accuracy-related penalty?

---

[12] Such work has been known to spark a change in careers. See I Wanna be a Producer on "The Producers" (Sony Classical) (describing relative attraction of theater life to dealing with accounting details).

Act II.  Discussion

A.  Did Petitioner Carry on His Playwriting With a Profit Motive?

Respondent noted in his pretrial memorandum that petitioner is aggressive in claiming deductions:

| Year | Sch. C Receipts | Sch. C Expenses |
|------|------|------|
| 1993 | $    0.00 | $ 27,924.00 |
| 1996 |      0.00 |   23,353.00 |
| 1997 |      0.00 |   24,703.00 |
| 1998 |      0.00 |   33,093.00 |
| 1999 |      0.00 |   27,128.00 |

Petitioner argues that this is nothing more than a consequence of the long time it takes many artists to realize a return on their investment of time and money.  He contends that he has consistently intended to profit from his playwriting.  At trial he offered evidence of various rewards he has already received, including cash bonuses, an increase in salary, travel opportunities, and professional recognition.  He maintains that he expects to achieve even more dramatic success, and he was sincerely buoyed in his hopes by many now-famous artists who achieved renown posthumously.[13]

Respondent, noting that the deductions seem to offset most

---

[13] Petitioner also suggested that the deductions at issue were unreimbursed employee expenses, but he did not fully develop this argument at trial.  Those expenses we identify as deductible we allow as playwriting expenses.

of petitioner's other income, argues that petitioner's claim of a profit motive for his playwriting is pretextual.[14]

Section 183 disallows deductions for an activity not engaged in for profit, except to the extent it produces income. Regulations exist that list a number of factors for us to consider in deciding whether a taxpayer was seeking to make a profit. Sec. 1.183-2(b), Income Tax Regs. These factors are not exclusive, and we do not decide the issue on the basis of a single factor or a mathematical preponderance of factors. Holmes v. Commissioner, 184 F.3d 536, 544 (6th Cir. 1999), revg. on other grounds; Osteen v. Commissioner, 62 F.3d 356, 358 (11th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1997-401; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

This Court has previously recognized that artists must be judged with an eye to posterity. In Churchman v. Commissioner, 68 T.C. 696 (1977), we allowed deductions claimed by a sculptor

---

[14] A celebrated monologist has related that his own tax trouble prompted a former IRS Commissioner to suggest a more colloquial characterization. "[Y]ou know what a pisher is? A pisher is a guy who feels entitled to all of the benefits of civilization, but feels no obligation to pay his fair share." Kornbluth, supra (quoting S. Cohen). See generally Kozinski and Volokh, *Lawsuit, Schmawsuit*, 103 Yale L.J. 463 (1993) (describing use of Yiddish to "add spice" to legal opinions, noting prevalence of chutzpah in much litigation); and see specifically id. at 463 n.4 (suggesting schnorrer as more appropriate characterization).

who had not yet achieved profitability, but nevertheless maintained a studio and gallery and participated in shows. We recognized then that economic success in the world of fine art frequently takes longer to achieve than success in other fields. The same is true of literature. Id. at 701-702. In Vitale v. Commissioner, T.C. Memo. 1999-131, affd. 217 F.3d 843 (4th Cir. 2000), we allowed the taxpayer to deduct many of his expenses of researching a book, despite the fact that he had not yet achieved profitability as an author. Petitioner's activity is reminiscent of Vitale's--he has likewise engaged in extensive research, generated large losses, and claimed his intent was ultimately to achieve a profit.

With this special lens in place, we look at each of the factors listed in the relevant regulation. The first is whether the activity was run in a businesslike way. Sec. 1.183-2(b)(1), Income Tax Regs. In Churchman, we listed six reasons for finding that her activity was: (1) she designed an art gallery and maintained it for a year; (2) she kept a mailing list to announce her shows; (3) she traveled to out-of-town locations to show her art; (4) she had published a book; (5) in the face of poor sales, she tried to change her material to meet public demand; and (6) she had kept records of her sales and expenses, albeit not complete books and records.

Professor Calarco has shown similar indications of business-

like activity. The marketing of art--because it may take the form of gallery shows and sales--is more readily visible than the marketing of drama or musical theater; nevertheless, a parallel exists between the marketing of sculpture in Churchman and petitioner's strenuous efforts to get his various plays produced. For example, the petitioner had a play read in Lincoln Center as early as 1990. In 1997--the year at issue--he was almost completely *un*successful in marketing his work. But, in a real-life peripeteia, his long-developing play "*Beethoven is . . . .*" won first-prize (from among hundreds of entries) in a National New Play Competition sponsored by Humboldt State University. This won the play a production at the university, and entitled petitioner to a two-week residency including travel and a $1,000 royalty. He also received various administrative benefits from Wayne State (including a sabbatical) that both recognized and furthered his playwriting. He traveled to get his play before audiences both in full performance and for readings. He also worked at adapting "*Beethoven is . . . .*" into a screenplay, as well as creating a stage version suited to smaller theaters. He kept records of many of his various expenses, such as travel logs and receipts.[15] Thus, we find that petitioner did in fact carry

---

[15] We look to those successes and activities from later years as part of the examination of "all facts and circumstances" required by Sec. 1.183-2(b), Income Tax Regs. Cf. Regan v. Commissioner, T.C. Memo. 1979-340.

on his playwriting in a businesslike manner.

The second factor that the regulation lists is the expertise of the taxpayer or his advisers. Sec. 1.183-2(b)(2), Income Tax Regs. We cannot imagine an individual better qualified for the playwriting trade than petitioner. He has a Ph.D. in drama and has published numerous pieces on dramatic criticism and theory, as well as his own poetry. His educational and professional background meet and perhaps exceed the level of taxpayer expertise we found in Churchman. (Though we also note that academic employment is no prerequisite for expertise in writing,[16] as the achievements of insurance executives,[17] nurses,[18] and shut-ins[19] attest.)

The third factor is the time and effort expended by the taxpayer in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. The sheer extent of petitioner's documentation supports the proposition that he approached his playwriting in a businesslike manner. Furthermore, petitioner has been

---

[16] Dana Gioia, "Can Poetry Matter?" 267 The Atlantic 94-95 (May 1991) decrying "migration of American literary culture to the university."

[17] See Harold Bloom, "Wallace Stevens, A Comprehensive Study Guide" 16 (2003).

[18] See Frances Winwar, "American Giant, Walt Whitman and His Times" 253 (1941).

[19] Richard B. Sewall, "The Life Of Emily Dickinson" 474 (Harvard University Press Paperback Edition, 1994).

professionally involved with dramatic production for almost 40 years, and his interest in the activity can hardly be said to be passing or casual.

The fourth factor, the expectation that assets used in the activity will appreciate in value, sec. 1.183-2(b)(4), Income Tax Regs., is not relevant here.

The fifth factor, the success of the taxpayer in carrying on other similar or dissimilar activities, sec. 1.183-2(b)(5), Income Tax Regs., seems largely neutral. While petitioner has had a long and successful academic career in drama and has gained recognition from several well-known theaters and universities, he has not managed a truly profitable business activity.

The sixth factor, petitioner's history of income or loss from the activity, sec. 1.183-2(b)(6), Income Tax Regs., would appear to bear heavily against petitioner, since he apparently has never had a net gain from his playwriting. As noted in Churchman, however, this is not decisive:

> Such a history of losses is less persuasive in the art field than it might be in other fields because the archetypal 'struggling artist' must first achieve public acclaim before her serious work will command a price sufficient to provide her with a profit.

Churchman, 68 T.C. at 701-702. Further, under section 1.183-2(a), Income Tax Regs., an activity may be found to be engaged in for profit if there exists a "small chance of making a large profit." The example given in the regulations is of a wildcat

oil well; courts have found this legitimate profit motive to exist in a variety of cultural contexts, see, e.g. Dwyer v. Commissioner, T.C. Memo. 1991-123 (sponsorship expenses of NASCAR racing were reasonable given potential prize money); Plunkett v. Commissioner, T.C. Memo. 1984-170 (same for truck-pulling competitions).  However, the Code, like postmodern literary theory, does not privilege any boundary between high and popular culture--that petitioner entertained similar expectations of ultimately achieving a large profit with his work is enough.

The seventh factor, the amount of occasional profits earned through the activity, sec. 1.183-2(b)(4), Income Tax Regs., weighs heavily in favor of petitioner's having a profit motive. In years after 1997, he won both a fully paid sabbatical and an additional $7,000 research grant to reward and aid his playwriting.  See Grommers v. Commissioner, T.C. Memo. 1992-343 (subsequent years relevant to section 183 analysis).  While this is not income from an activity in the usual sense of sales revenue, it certainly is an economic benefit that petitioner received from his playwriting.

The eighth factor is the financial status of the taxpayer. Sec. 1.183-2(b)(8), Income Tax Regs.  The regulations provide

that an absence of substantial income to the taxpayer from other sources may indicate a profit motive, while the presence of other substantial income may indicate a lack of profit motive. This is particularly true if the activity has personal or recreational elements. This factor does weigh against petitioner, as his primary income is from his teaching position, and allowing his playwriting deductions would largely offset his teaching wages.

The ninth factor is whether there are elements of personal pleasure or recreation present in the activity. Sec. 1.183-2(b)(9), Income Tax Regs. Clearly playwriting is something petitioner enjoys. Nevertheless, pleasure is not irreconcilable with a profit motive. Schwartz v. Commissioner, T.C. Memo. 2003-86.

Considering these factors together, we find that petitioner has carried on his playwriting with the objective of making a profit: both the documentary and testimonial evidence show petitioner's goal was not merely posthumous renown but profit in the here-and-now. Section 183 does not therefore limit his deductions. Professor Calarco is a playwright, not a pisher. See Kozinski & Volokh, supra, 103 Yale L.J. at 465 n.14.

B.   Has Petitioner Substantiated His Expenses?

All taxpayers, even playwrights, are allowed to deduct the ordinary trade or business expenses they incur during the year. Sec. 162(a). But this often leads to temptation. Our

predecessor, the Board of Tax Appeals, recognized more than 60

years ago that without firm limits, taxpayers would seek to

deduct

> The fee to the doctor, but for whose healing
> service the earner of the family income could not
> leave his sickbed; the cost of the laborer's
> raiment, for how can the world proceed about its
> business unclothed; the very home which gives us
> shelter and rest and the food which provides
> energy, might all by an extension of the same
> proposition be construed as necessary to the
> operation of business and to the creation of
> income. [Citations omitted.]

Smith v. Commissioner, 40 B.T.A. 1038-1039 (1939) (citation

omitted), affd. 113 F.2d 114 (2d Cir. 1940).

In extreme cases, this can even lead to a kind of deduction

fever:

> "Itemizing?  What's that, Satan?"

> "Well, you see, Josh, now that you're not just a
> salaried copy editor but also a freelance
> television critic, you can file a Schedule C and
> deduct your legitimate business expenses...."

> So I went home, waded as usual through the pot
> smoke of my roommates, shut the door, and looked
> around my room.  What was a "legitimate business
> expense"?  Okay, I'm a television critic, so... the
> television!  Yes!  Because I need something to
> criticize!

> Okay, so the television ...  And then--yeah, the
> VCR, because I can't watch every episode of "T.J.
> Hooker." ...

> And, of course, the videotapes. ...  And the
> replacement labels for the tapes, which I get from
> Radio Shack.  ... Oh!--and the TV Guide, which
> guides me to the television! ...  And the books of
> television criticism I've bought.  And actually,

> the books I've bought that <u>aren't</u> television
> criticism: they've still informed my criticism of
> the television. ...  Oh!--and the chair I sit in,
> of course: very important what your posture is when
> you criticize a television.  And the food I eat--
> which literally makes up the cells that form the
> critic of the television....

Kornbluth, <u>supra</u>.

Petitioner has fallen victim--at least at times--to this fever, claiming many quotidian activities, such as reading newspapers and renting movies, to be "business-related".  He is, at some level of abstraction, no doubt correct.  But we must administer the tax laws as they are.  Having decided that petitioner intended to profit from his playwriting, we must sift through the specific deductions that he claims so as to determine their allowability.

Petitioner's Schedule C deductions fall into fifteen categories, named as follows on the 1997 return:[20] (1) mileage; (2) automobile depreciation; (3) interest; (4) legal and professional services; (5) supplies; (6) travel; (7) books, recordings, and video; (8) "business cellular;" (9) Internet; (10) software; (11) "tickets to various performances, viewing;" (12) "the business portion of phone expense (70 percent);" (13) "miscellaneous from cash (ATM);" (14) periodicals; and

---

[20]  Unfortunately, the categories in petitioner's posttrial submission do not match the categories on the return.  We discuss the categories as they appear on the return.

(15) copy services.[21]

Section 6001 and its regulations require taxpayers to maintain records sufficient to permit verification of income and expenses. See sec. 1.6001-1(a), Income Tax Regs. The burden is on petitioner to demonstrate his right to the deductions. Sec. 7491(a); Rule 142(a); Underwood v. Commissioner, 56 F.2d 67 (4th Cir. 1932). But the IRS will generally accept certain proofs of expenditures as adequate substantiation. See Rev. Proc. 92-71, 1992-2 C.B. 437. Petitioner must in all cases provide evidence to establish a sufficient connection between the deduction and his trade or business. Gorman v. Commissioner, T.C. Memo. 1986-344. This substantiation may vary by circumstance. Welch v. Helvering, 290 U.S. 111, 115 (1933).

Certain deductions, moreover, require enhanced substantiation under sections 274 and 280F.[22] These include travel, food and entertainment expenses, and any expenses

_____

[21] In a number of these categories, respondent initially allowed the deductions (provided that the section 183 issue was resolved in petitioner's favor) in the notice of deficiency. Generally, respondent bears the burden of proof when introducing a new issue. Rule 142(a); Sundstrand v. Commissioner, 96 T.C. 226, 347-348 (1991). Respondent has not shown any specific reason for a departure from his original position, so in those categories where respondent has already allowed deductions in excess of the documented amounts we will grant petitioner the benefit of the original allowance.

[22] See Master of the House on *Les Miserables: Original Broadway Cast* (Geffen Records) (suggesting benefits of enhanced substantiation requirements for certain innkeepers).

relating to certain forms of "listed property." For these items, taxpayers must show that an expense was "directly related" to business activity, and must provide the business purpose, amount, and time and place of the expenditure. Sec. 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). We consider petitioner's claimed deductions in this context.

1.  <u>Mileage</u>

Section 280F(d)(4)(A)(i) makes a personal automobile "listed property", and thus subject to enhanced substantiation requirements. Section 1.274-5T(c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985) describes those requirements, and provides that "[w]ritten evidence has considerably more probative value than oral evidence alone. In addition, the probative value of written evidence is greater the closer in time it relates to the expenditure or use." Sec. 1.274-5T(c)(1). Section 1.274-5T(c)(2)(ii)(C)(2), Temporary Income Tax Regs., 69 Fed. Reg. 32782 (June 10, 2004), specifically identifies "a record of the business use of listed property, such as a computer or automobile, prepared in a computer memory device with the aid of a logging program" as an adequate written record. Petitioner has provided just such a record.

Section 1.274-5T(b)(2), Temporary Income Tax Regs., lists the information a taxpayer's records must contain to substantiate travel away from home. These are: (1) the amount of the expenditure; (2) the date of each departure and return and number

of days spent away, (3) destination, and (4) the business purpose of the travel.  Petitioner's log contains all of this data, always in the form of the amount, the date of the travel, the destination (either the University of Michigan library in Ann Arbor, the Detroit Public Library, or the Purdy Library at Wayne State[23]), and the purpose (always recorded as "Research Beethoven").

This travel log, however, raises significant issues of credibility.  It records that, from January to May 1997, petitioner spent *every* Tuesday and Thursday (with the exception of May 22, 1997), conducting research at either the Purdy Library or the Detroit Free Library.  This seems to correlate with petitioner's testimony regarding his teaching schedule during the 1997 spring semester at Wayne State University.  The uniformity of schedule, however, strongly suggests that petitioner merely ascribed mileage deductions to his nonteaching days, without regard to actual events.  That petitioner claimed a mileage deduction for July 4th and Memorial Day, days when many libraries are closed and most people do not work, also suggests this.  Further, petitioner testified at trial that there were two

---

[23] It is not clear from the record whether these libraries are "temporary work locations" for purposes of exempting this travel from commuting expense treatment.  See Walker v. Commissioner, 101 T.C. 537 (1993); Daiz v. Commissioner, T.C. Memo. 2002-192 (2002); Rev. Rul. 90-23, 1990-1 C.B. 28; Rev. Rul. 94-47, 1994 C.B. 18.  Since we have in any event decided to disallow the mileage expenses, we need not reach this issue.

rehearsal periods during the year when his responsibilities encompassed periods of seven-day weeks of 14 hours a day. Yet, an examination of his travel log indicates no break in his research activities of longer than three days, with one exception during the first week in December.

We thus find that petitioner's log is inadequate substantiation because it is not credible. We have no doubt that petitioner engaged in extensive research for his play, and that he did travel significant distances to conduct that research. But we are unable to allow deductions for that mileage based on the evidence he submitted. In many instances, when confronted with deficient evidence, courts may resort to the rule of <u>Cohan v. Commissioner</u>, 39 F.2d 540 (2d Cir. 1930)(the <u>Cohan</u> rule)[24] and estimate the proper deduction amount. This rule is not available, however, when dealing with "listed property" under section 274. <u>Sanford v. Commissioner</u>, 50 T.C. 823, 827 (1968), affd. 412 F.2d 201 (2d Cir. 1969). Thus, we disallow petitioner's claimed mileage deductions in full.

---

[24] Although best known to tax lawyers for his rule, George M. Cohan was also a playwright, actor, and songwriter, who wrote such stage classics as "The Man Who Owned Broadway." His life outside tax litigation was the source material for the classic Jimmy Cagney film, Yankee Doodle Dandy (Warner Bros. 1942). (We also note that this year marks the centennial of Cohan's breakout role in Little Johnny Jones, featuring <u>Yankee Doodle Boy (I'm a Yankee Doodle Dandy)</u> and <u>Give My Regards to Broadway</u>.)

2.  Automobile Depreciation

Having decided that petitioner failed to substantiate his mileage, we are compelled to disallow petitioner's claimed depreciation deduction as well--to claim any deduction related to use of his personal automobile, petitioner must meet the enhanced substantiation requirements.  Whalley v. Commissioner, T.C. Memo. 1996-533.

3.  Interest

Petitioner claimed $7,392 in interest expenses.  To the extent that this amount reflects otherwise deductible mortgage interest, respondent allowed its deduction in the notice of deficiency, and we sustain that allowance.

Petitioner also submitted documentation of $4,880 in interest expenses from his various credit cards.  In Exhibit 17-P, petitioner showed that the proper percentage of credit card interest allocable to his Schedule C expenses is 78 percent.  We believe this amount is overly generous to petitioner, especially in light of the excess claims we find he made in the supply category.  See infra.  Still, petitioner has shown that he paid substantial interest charges on many consumer credit cards for expenses properly attributable to his Schedule C activities. Under the Cohan rule, when presented with some factual basis upon which to rely, we are allowed to estimate the amount of interest deductions properly allowable.  Schroeder v. Commissioner, T.C. Memo. 1996-336.  We estimate that 65 percent of the claimed

$4,880, or $3,172, is properly deductible by petitioner.

4.   Legal and Professional Services

In the notice of deficiency, respondent allowed $171 in professional expenses. Petitioner submitted documentation of $221 in legal expenses. We find that amount to be deductible. The remainder of the claimed $468 of legal and professional expenses deduction is unsupported by any evidence and so we deny it.

5.   Supplies

On his Schedule C, petitioner claimed a deduction for $3,797 in supplies. Respondent, in the notice of deficiency, allowed $2,544. Petitioner's posttrial submission details only $2,864 for supplies. This number must be reduced by the expenses that represent copying (which we discuss separately) that were originally included in supplies. Further, the number must also be reduced by petitioner's cable and Internet expenses for which petitioner has offered no credible business purpose, let alone documentation of business use. These reductions bring the documented amounts well below the original amount allowed in the notice of deficiency, and we sustain the finding in the notice that only $2,544 is allowable.

6.   Travel

Petitioner claimed a deduction of $801 for his travel expenses to the Stratford Drama Festival and to Ann Arbor to conduct research. We find that he has satisfied the requirements

of sections 274 and 280F for deducting his drama festival expenses by documenting the date, cost, and purpose of his visit. But as we noted above, we do not credit petitioner's travel log, and so it does not support his position that he spent $171.31 in Ann Arbor on business purposes on November 16, 1997. As such, we disallow that deduction. The log does indicate, and we find to be believable, an expense for $189.04 at the Courtyard Marriott in Ann Arbor on March 16, 1997. We allow that deduction. His estimates of cash expenditures at fast-food outlets and other establishments do not meet the requirements of sec. 274, and are thus disallowed.

7. <u>Books, Recordings, Videos</u>

Petitioner claimed deductions for books, recordings, and video in the amount of $3,324. His posttrial submission details $4,358 of expenses in this category. A number of these items, however, must be fully disallowed or considered in a different category. These include expenses for software, video, and newspaper subscriptions. The removal of these items results in $2,440.25 for this category.

The category's other expenses are more ambiguous. Some are no doubt legitimate, and respondent has not identified any specific legal theory for their disallowance. But allowing all the deductions would be ignoring some obvious questions raised by a great number of nonspecific items, such as large drug store receipts. Under the <u>Cohan</u> rule, we may estimate the proper

amount of allowable deductions based on the evidence and our view as to the credibility of the witnesses. Feingold v. Commissioner, T.C. Memo. 1956-214. We find that petitioner is entitled to deduct 40 percent of the $2440.25 in this category that has not otherwise been specifically addressed.

8. "Business Cellular"

Under section 280F(d)(4)(A)(v), cellular phones are listed property and thus subject to the heightened substantiation requirements of section 274, which petitioner has failed to meet. This category of deductions is entirely disallowed.

9. Internet

Petitioner has offered no evidence of his business use of the Internet. We infer from his electronic banking records that he used the internet to track his business (and personal) expenses. This Court has previously characterized internet expenses as utility expenses. Verma v. Commissioner, T.C. Memo. 2001-132. Under the Cohan rule we may estimate the business portion of utility expenses. See Pistoresi v. Commissioner, T.C. Memo. 1999-39. We estimate that 20 percent of his internet expenses were business-related.

10. Software

There are $267.48 in software expenses listed in petitioner's posttrial submission. Of this amount, $82 appears to have been for multimedia programming, and we are satisfied

that a connection exists between that programming and petitioner's playwriting. An additional $107.48 appears to be for software related to business management. These deductions are allowed. It is unclear what the rest are for; we disallow a deduction for them.

11. "Performances, Viewing"

Petitioner has submitted evidence of approximately one hundred expenditures in this category, constituting his theater, video rental, and other sundry expenses for the year. Several reasons exist as to why we must disallow these deductions. One is petitioner's having undermined his own credibility in this area. At trial, in response to a direct question, petitioner testified that *every time* he listens to a CD or watches a movie he is engaged in playwriting and not recreation. This suggests a less than candid assessment of his business expenses.

Even assuming that petitioner were believable on this point, these deductions would still be precluded under section 1.274-2(c)(3)(i), Income Tax Regs., which provides that the taxpayer must have more than a "general expectation" of deriving income for an entertainment expense to be deductible. Had petitioner testified as to a particular difficulty with the plot or characters or language of his play that he sought to fix by watching a specifically selected play by someone else, that specific expectation would *perhaps* justify a deduction. Merely broadening one's horizons is not enough. The credibility and

documentation issues, however, are merely elements of the ultimate determinative factor--petitioner has not met his burden under sections 274 and 280F for substantiating entertainment expenses.

12. Telephone

Section 262 provides that the first phone line into a taxpayer's home is not deductible. Petitioner thus is unable to deduct expenses relating to his phone line, absent a showing that there was some service or feature of the line dedicated to his business activities, a showing he did not make. Cf. Popov v. Commissioner, T.C. Memo. 1998-374, revd. on other grounds 246 F.3d 1190 (9th Cir. 2001).

13. Miscellaneous Cash

We are not required to accept self-serving testimony from petitioner regarding his estimates of cash spent on his activities. Even were we to accept his assertion of how much cash he spent, we still would not be convinced that those amounts went to business, as opposed to personal, expenses. Thus, we disallow the deduction of these amounts.

14. Periodicals

On petitioner's Schedule C, he claimed a deduction for $1,055 in periodical expenses. This entire amount is documented in his posttrial submission. The documentation, however, shows that $838 of this total was spent on subscriptions to major

newspapers. The cost of a "daily newspaper of general circulation is inherently a nondeductible personal expenditure", <u>Wheeler v. Commissioner</u>, T.C. Memo. 1984-425 (quoting <u>Wallendal v. Commissioner</u>, 31 T.C. 1249, 1252 (1959)), so we disallow these amounts. We also disallowed the $120 for subscriptions to PC World, PC Magazine, and Byte. Petitioner has not demonstrated to our satisfaction that his purchase of these magazines had a business purpose. Thus, the only deductions that we allow in this category are the $97 he spent to subscribe to Poetry and Gramophone.

15. <u>Copy Services</u>

As indicated in the notice of deficiency, respondent originally allowed petitioner's deduction in the amount of $586 for copy services. While petitioner has submitted documentation of copy expenses of only $213.95,[25] it is quite reasonable for a document intensive activity such as writing and research to incur significant copy expenses, and we see no reason to depart from respondent's original allowance.

C.    <u>Is Petitioner Subject to Penalties Under Sec. 6662?</u>

> *"I said 'Interest <u>and</u> penalties?  Isn't that kind of Overkill?  I mean: Hey--I <u>get</u> it!'"*
> Kornbluth, <u>supra</u>.

---

[25] The assertion that petitioner submitted this number warrants clarification; there is an amount of $169.43 entered on the bottom line of a page in his submission with the words "copy services" handwritten at the top. When combined with a $44.52 item in the "supplies" category that is listed as "photocopies" a total of $213.95 results.

Respondent has asked for the imposition of penalties pursuant to section 6662. To the extent that petitioner's case fails, it does so largely because petitioner's records bear internal inconsistencies which make it difficult to rule in his favor. This is primarily a factual determination, and does not indicate that petitioner has taken an "unreasonable position." Furthermore, petitioner did enter significant amounts of documentation into evidence. We take this factual documentation into account in weighing whether a taxpayer should be subject to section 6662 penalties. Kluener v. Commissioner, 154 F.3d 630, 637-38 (6th Cir. 1998). Additionally, section 1.6662-3(b)(2), Income Tax Regs., specifically provides for an exception from penalties in case of taxpayer reliance on any one of a number of IRS-issued materials, including the information materials to which petitioner frequently cited. Nevertheless, we uphold part of the accuracy-related penalty. Sec. 6664(c)(1). The penalty is properly applied to those portions of the deficiency relating to the disallowed deductions from category 7 (books, recordings, video); category 11 (performances, viewing); and category 13 (miscellaneous cash). Despite petitioner's good faith efforts in other areas, it is not credible to assert that he did not realize the significant elements of personal benefit and documentation issues inherent in these disallowed amounts.

<u>Epilogue</u>

Dramatists used to finish with some rhymes,
Mostly iambs with a pinch of dactyly,
But in these more prosaic times
Works usually end more matter-of-factily.

In our Court, though, the oldest ways seem somehow to survive--

<u>A decision will be entered</u>

<u>under Rule 155</u>.